**SELECT TIRE SALVAGE CO., Inc.**
v.
**The UNITED STATES.**

**The CONNECTICUT TIRE COM-
PANY, Inc.**
v.
**The UNITED STATES.**
Nos. 325–62–326–62.

United States Court of Claims.
Dec. 15, 1967.

Carl F. Bauersfeld, Washington, D. C., for plaintiff, Robert Ash, Washington, D. C., attorney of record, Ash, Bauersfeld & Burton, Washington, D. C., of counsel.

William C. Ballard Jr., Washington, D. C., with whom was Asst. Atty. Gen., Mitchell Rogovin, for defendant.

Before COWEN, Chief Judge, LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS,. Judges.

OPINION

NICHOLS, Judge.*

These two cases, consolidated for trial, involve the taxability of tire carcasses imported by the plaintiffs from Europe, where they originally had been sold as new tires. The great majority of these carcasses had left on them a tread pattern of two thirty-seconds of an inch or less. Although the tread pattern was completely, or mostly, worn off, plaintiffs sought to purchase only carcasses in condition for recapping, with no sidewall damage, cracks, breaks, or oxidation damage. The imports were sold by the plaintiffs to recappers, except for some that were sold as scrap because rejected by recappers.

A tire carcass, such as that imported by the plaintiffs, is generally considered unsafe for use on a highway motor vehicle because the lack of a tread pattern creates a skidding hazard on a wet roadway. The Government here stipulates that it is unsafe. It is not dangerous *per se* to use a tire carcass on a dry roadway, but, because a driver never knows whether the roadway will be wet or dry, the average tire buyer would not buy a tire carcass for ordinary use on his car. However, there are some fugitive uses of imported tire carcasses on motor vehicles in their imported condition. And, some United States manufactured tires are likewise used until worn down to the condition of carcasses, or worse, in more

---

* At the direction of the court, Trial Commissioner William E. Day prepared find-

ings and an opinion which have been of substantial assistance to the court.

than an insignificant number. This is due, apparently, to the fact that economy-minded owners of automobiles using such tire carcasses have not yet concluded that the carcasses should be replaced. Even among such people, however, few would purchase another carcass as a replacement. Therefore, as a practical matter, the importation of large numbers of tire carcasses for sale and use *per se* as tires, would be unprofitable, and recapping such carcasses is a practical prerequisite to sale of any meaningful number of them. Plaintiffs, recognizing this fact, did not offer the imported tire carcasses for sale as tires. The only recognized market for such carcasses is the recappers.

The Commissioner of Internal Revenue assessed excise taxes on the tire carcasses imported by the plaintiffs and sold to recappers. The Commissioner also assessed penalties against the plaintiffs for failure to file excise tax returns.

Plaintiff, The Connecticut Tire Company, Inc., paid assessed excise taxes and penalties for the period April 1, 1955 to June 30, 1955, in the amount of $201.06, and now seeks a refund of that sum with interest.

Plaintiff, Select Tire Salvage Co., Inc., paid taxes and penalties assessed for the period January 1, 1960 to March 31, 1960, totaling $557.21, and now seeks a refund of such amount, with interest.

The two companies have common ownership and management.

Two questions are presented for decision: 1. (a) whether the 1955 items imported by the plaintiffs are taxable under Section 4071(a) of the Internal Revenue Code of 1954 as "tires wholly or in part of rubber" (26 U.S.C. § 4071, 1952 ed., Supp. II),[1] or (b) if the 1960 items are "tires of the type used on highway vehicles" (26 U.S.C. § 4071, 1952 ed.,

Supp. IV),[2] and 2. if the first question is answered in the affirmative, whether the assessment of penalties under Section 6651(a) of the Internal Revenue Code of 1954 (26 U.S.C. § 6651(a), 1952 ed., Supp. II) was authorized by the facts of these cases.

The tax is assessed upon the sale by the "manufacturer, producer or importer." Section 4071. Plaintiffs are taxable, if at all, as "importers," but the statutory machinery is such that the tax becomes due, if at all, not on the act of importation but on the subsequent sales. Thus it is that the tax is not collected by the Customs Service as an incident to passage of the articles through the Customs barrier.

I. Imposition of Excise Tax Under Section 4071(a) of the Internal Revenue Code

Although the tax is levied on "tires wholly or in part of rubber" or "tires of the type used on highway vehicles," the resolution of both cases depends solely on whether or not the tire carcasses imported by the plaintiffs are "tires" for excise tax purposes. The additional qualifying language—"of the type used on highway vehicles"—was added, after the 1955 sales of Connecticut Tire, by Section 204(a) of the Highway Revenue Act of 1956, 70 Stat. 387, 389, in substitution for "wholly or in part of rubber."[3] In the Congressional Committee Reports accompanying the Act (H.Rep. No. 2022, 84th Cong., 2d Sess. (1956–2 Cum.Bull. 1285), S.Rep. No. 2054, 84th Cong., 2d Sess. (1956–2 Cum.Bull. 1308)), U.S. Code Cong. & Admin. News 1956, p. 2822, it is clearly stated that the qualifying language was added so that only highway type tires would bear the burden of the additional tax to be then imposed, because the additional revenue was to be

1. The quoted phrase is the one applicable to the period April 1, 1955 to June 30, 1955, and relates to the tire carcasses imported by The Connecticut Tire Company, Inc.

2. The quoted phrase is the one applicable to the period January 1, 1960 to March

31, 1960, and relates to the tire carcasses imported by the Select Tire Salvage Co., Inc.

3. The phrase "if wholly or in part of rubber" was moved into the introductory phrase of Section 4071(a).

earmarked for Federal highway programs. The sole purpose of the qualifying language was to provide a basis for distinguishing between highway type and non-highway type tires. If the tire carcasses imported by the plaintiffs are "tires", they come within the ambit of the statute, regardless of its phraseology.

In the cases at bar, though the statute purports to define what a "tire" is for excise tax purposes, it begs the question for our purposes by defining a tire as a tire.[4] The Treasury Regulations under Section 4072, as applicable to the periods in question, contain two definitions: first, that provided for the term "tires of the type used on highway vehicles" suffers from the same deficiency as the statutory definition;[5] second, that provided for the term "tires" includes rubber casings (also known as tire carcasses), but further provides that the "tire" must be " * * * *capable* of use as a means of transporting a person or burden. * * * "[6] (Emphasis supplied.)

Webster's New World Dictionary of the American Language, College Edition (1962), defines the phrase "capable of"

as: "having the ability or qualities necessary for." It would be a strain to hold that a tire carcass, generally considered unsafe for use on a highway motor vehicle, still has the abilities or qualities *necessary* for use as a tire.[7]

In Skinner v. United States, 8 F.Supp. 999 (S.D.Ohio, 1934) the court, in interpreting Section 602 of the Revenue Act of 1932 which imposed a tax on "tires wholly or in part of rubber * * *", declared (at p. 1006), this tax "applies only to newly manufactured tires * *." The holding therein was that retreaded tires, not tire carcasses, were not subject to the excise tax. However, it would appear to be *a fortiori* that the phrase *"newly manufactured* tires" would not have been applied by that court to tire carcasses. The Internal Revenue Service now says that the term "tires" does not include recaps or retreads unless the recapping process is "from bead to bead." Treas.Reg. § 40.4072–1(e) (2).

In Supreme Tire & Rubber Co. v. United States, 7 Cust.Ct. 193, C.D. 566 (1941), the Customs Court, First Division, upheld the Customs Service in classifying worn tires usable only after retreading

---

4. Section 4072 of the Internal Revenue Code of 1954 (26 U.S.C. § 4072, 1952 ed., Supp. IV) provides in part:

   "§ 4072. Definitions

   * * * * *

   "(c) Tires of the type used on highway vehicles.—For purposes of this part, the term 'tires of the type used on highway vehicles' means tires of the type used on—

   "(1) motor vehicles which are highway vehicles, or

   "(2) vehicles of the type used in connection with motor vehicles which are highway vehicles."

   Before this definition was introduced into the Code the statute did not define the term "tire."

5. See Treas. Reg. 40.4072–1(c) (1) (26 CFR, Sec: 48.4072–1).

6. Treas.Reg. 40.4072–1(e) (26 CFR, Sec. 48.4072–1(e)) states: "The term 'tires' includes rubber casings, hoops and strips or bands of all kinds designed and shaped or built to form the tread of or to fit a vehicle wheel. Tires of either the pneumatic or solid type which fit or

form the tread for wheels of any article which is capable of use as a means of transporting a person or burden are taxable as tires. * * * "

It might be argued that the phrase "capable of use" refers only to pneumatic or solid type tires and not to rubber casings, etc. However, S.T. 660, XII–1 C.B. 385 (1933), in explanation of the term "tires" in the Revenue Act of 1932, under which the tire excise tax was introduced into the Revenue Code, also specified that the rubber bands or hoops had to be "capable of use" as a means of transport before they could be taxed as tires. Thus the rubber casings, etc. must still be capable of such use. (We note that S.T. 660 has been declared obsolete in Rev. Rul. 67–199, I.R.B. 1967–25, 13.)

7. Webster's Third New International Dictionary of the English Language, Unabridged (1961), supports this conclusion when it states: "carcass * * * 4 * * * c * * * (2): a worn rubber tire still capable of useful service *when* recapped * * *." (Emphasis supplied.)

or vulcanizing under paragraph 1537(b) of the Tariff Act of 1930 as "automobile tires composed wholly or in chief value of rubber." At first blush this might seem highly relevant here, and it does merit consideration; however, the importer to prevail there had to show the articles were "scrap" and in rejecting this the Customs Court's holding was not in conflict with the plaintiff's position herein. There is nothing anomalous in an article being a "tire" for Customs purposes and not one for Internal Revenue purposes, where the legislative plan and purposes are so very different, as we will show. Tax lawyers rarely cite customs cases, and vice versa, and the reasons for this are not only professional compartmentalization, but also that the materials may well be misleading outside their own proper field. The customs lawyer starts with the proposition that all imported articles are dutiable unless expressly exempted, from which it follows that an *eo nomine* designation covers all forms of the article. United States v. Victoria Gin Co., Inc., 48 CCPA 33, C.A.D. 759 (1960); Nootka Packing Co. v. United States, 22 CCPA 464, T.D. 47464 (1935); United States v. Page N. Goffigon, 43 CCPA 172, C.A.D. 625 (1956). But even he admits that though the article be literally named, it is not included if clearly outside the statutory purpose. United States v. Durst Mfg. Co., 46 CCPA 74, C.A.D. 700 (1959); Sears Roebuck & Co. v. United States, 46 CCPA 79, C.A.D. 701 (1959). In the case of excises such as here involved only a few of the possible objects of taxation are taxed; hence no guide for interpretation can be found in a mere horror of leaving articles unprovided for. More careful and frequent attention to the legislative purpose may then be a requisite.

On the whole record here, we are unable to say that the word "tire" in the Internal Revenue Code is so free from ambiguity that resort to extrinsic aids is unjustified. The testimony and arguments include a good deal of semantics on the part of witnesses and counsel on both sides. In general, the Government sought to show that the word "tire" in common speech includes all forms of the article, however worn, defective, disapproved, or unsafe. Plaintiff, on the other hand, introduced evidence that "tire" and "tire carcass" are distinct and mutually exclusive commercial categories. This included such disinterested and eloquent witnesses as price lists and catalogues published *ante litem motam*. There is nothing to show that any of this material was before the Congress whose intent must be our lodestar. The testimony and exhibits must be considered merely advisory, the meaning of "tire" in the statutes being a question of law.

The evidence did not establish any clear dichotomy between commercial and common meaning, and it is reasonable to suppose that none exists. The articles the statute taxes are familiar to the average American. In National Rubber Filler Co. v. United States, 63 Ct.Cl. 337 (1927), construing a predecessor of the instant enactment, we said at p. 341:

> * * * Congress, in imposing taxes upon the articles mentioned in section 900 of the revenue laws, was not dealing in obscure and involve trade terms. Tires, inner tubes, and accessories, when used in connection with motor vehicles, have a firmly established trade meaning. Parts and accessories, as said by this court in Martin Rocking Fifth Wheel Co. v. United States, 60 Ct.Cl. 466, 473, "are no longer as Greek to the average inhabitant." The purchaser of a motor vehicle is generally cognizant of what is included in the terms, and the dealer now assures his customer that the car is sold fully equipped.

Thus it seems that to the extent plaintiff raised a question about the trade or commercial meaning of the word "tire" it goes to the common meaning also. Cases such as Norris Dispensers Inc. v. United States, 211 F.Supp. 79 (D.C.Minn. 1962), aff'd. 325 F.2d 140 (8th Cir. 1963), though they invoke the "plain and ordinary meaning" of an excise classification, refer to "actual practical com-

mercial fitness" also. The excise tax laws do not deal with esoteric commodities. The Internal Revenue Service itself, in order to find out the name of an item, has in the past looked to the tire retreading industry. See Rev.Rul. 62–223, 1965–2 C.B. 420.

The Government's argument based on the common meaning of the word "tire" suffers from the further infirmity that it proves too much. If a tire carcass is a "tire" in common meaning, then a retread must be a "tire" also, or more so, yet we have the authority of the Regulation, supra, that it is not.

To the extent that capability for use is the test, a mere possibility for use is not sufficient if it is not actual commercial fitness. Grant v. White, 219 F.Supp. 774, 778 (S.D.Ill.1963); Bostitch Inc. v. United States, 164 F.Supp. 877 (D.R.I. 1958); DeLuxe Check Printers Inc. v. United States, 99 F.Supp. 785, 788 (D. Minn. 1951). Thus the Government fails to resolve the ambiguity by its proof that some persons are so rash as to ride on tires with the tread worn smooth, and some of them live to tell the tale. This does not make a case of "commercial" fitness.

We must, therefore, turn to the scheme and purpose of the statute, and see what construction of the word "tire" best comports with it.

> \* \* \* It is a familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers \* \* \*. This is not the substitution of the will of the judge for that of the legislator, for frequently words of general meaning are used in a statute, words broad enough to include an act in question, and yet a consideration of the whole legislation, \* \* \* or of the absurd results which follow from giving such broad meaning to the words makes it unreasonable to believe that the legislator intended to include the particular act. Church of the Holy Trinity v. United States, 143 U.S. 457, 459, 12 S. Ct. 511, 36 L.Ed. 226 (1892).

> \* \* \* "The object designed to be reached by the act must limit and control the literal import of the terms and phrases employed." Id. at 460, 12 S.Ct. at 512.

That case dealt with a provision of the immigration laws, but like principles prevail in the revenue field. Helvering v. N. Y. Trust Co., 292 U.S. 455, 464, 54 S. Ct. 806, 78 L.Ed. 1361 (1934); Helvering v. Hammel, 311 U.S. 504, 510–511, 61 S.Ct. 368, 85 L.Ed. 303 (1941); General Dynamics Corp. v. United States, 324 F.2d 971, 163 Ct.Cl. 219 (1963); Procter & Gamble Mfg. Co. v. United States, 19 CCPA 415, T.D. 45578 (1932), cert. denied 287 U.S. 629, 53 S.Ct. 82, 77 L.Ed. 546; Jennings v. United States, 168 F.Supp. 781, 144 Ct.Cl. 28 (1958).

The purpose of a revenue act is to raise revenue, and this was specifically, the purpose of § 602, Revenue Act of 1932, the forerunner of § 4071(a). See H.Rep. No. 708, 72d Cong. 1st Sess. (1939–1 C.B. (Part 2) 457, 479); S.Rep. No. 665, 72d Cong. 1st Sess. (1939–1 C.B. (Part 2) 496). It ought to be no surprise if a customs tariff raises no revenue because it is prohibitive of importation. That is often the object aimed at. An internal tax may less often be so intended (see Internal Revenue Code of 1954, Subtitle D, Chapter 39, Subchapter A, Parts II and III, relating to the taxation of marihuana—26 U.S.C. §§ 4741–4746, 4751–4757, 4761 and 4762, and 4771–4776, 1952 ed. Supp. II—and later amendments) but when it is, the purpose is usually clear. When this is not obviously the object, an internal tax on imports, prohibitive of importation is an anomaly that requires explanation. We will show, and it hardly can be denied, that this tax is so prohibitive, as the Government construes it. It has produced no reason why the Congress should desire this and pointed to no indication, express or implied, that it did so.

Next, in the report above cited, the House said (at p. 479) "The rate must be low, so that undue burdens will not be imposed \* \* \*." The rate here, converted to *ad valorem* equivalent, is rough-

ly 50% to 80%, or 100% of the value of the tire, depending on the date of sale, a burden not paralleled or approached so far as we know, in any excises of the group involved, though no doubt it may be exceeded among sumptuary excises such as those on liquor and tobacco.

Furthermore, the same report says "the tax must be imposed uniformly and without discrimination." Here the involved interpretation produces a highly discriminatory result. Moreover, it is directed against imports contrary to the commitment in the GATT (General Agreement on Tariffs and Trade), T.D. 51802 (as amended by T.D. 52167), Article III:

\* \* \* \* \*

"2. The products of the territory of any contracting party imported into the territory of any other contracting party shall not be subject, directly or indirectly, to internal taxes or other internal charges of any kind in excess of those applied, directly or indirectly, to like domestic products. Moreover, no contracting party shall otherwise apply internal taxes or other internal charges to imported or domestic products in a manner contrary to the principles set forth in paragraph 1. \* \* "

The GATT does not bind Congress or have the status of a treaty, because it has never been ratified. However, it is an agreed code of international good behavior. An unambiguous statutory command, contrary to the GATT, would of course prevail, but the one here involved can be construed to harmonize.

In Smith v. United States, 319 F.2d 776 (5th Cir. 1963) the court held that a somewhat similar provision in the Treaty of Friendship, Commerce and Navigation with Germany was not violated by the tax under the same Act assessed against used Volkswagens, but that was an *ad valorem* tax in which no real discrimination was shown.

Compare also China Liquor Distrib. Co. v. United States, 343 F.2d 1005, 52 CCPA 1, C.A.D. 847 (1964), cert. denied, 380 U.S. 962, 85 S.Ct. 1104, 14 L.Ed.2d 152 (1965), and cases cited therein, involving the much discussed and often reviled internal revenue tax on the water contained in Scotch and other distilled spirits imported below proof in bottles. The tax there is held not contrary to GATT because not discriminatory, since the importer could avoid the tax by importing at or over proof. The alleged discrimination arose in the scheme persisted in by Congress for a century, whereby spirits entered or withdrawn above proof, i. e., over 50% alcohol, are taxed on the volume they would have if diluted to 50%, while those entered or withdrawn under proof, are taxed on the actual volume. Domestic distillers pay the tax on their product at or above proof, add water and bottle afterward. Importers can minimize the tax in the same manner only if they bottle after importation, which not all are willing to do. The real discrimination, if there is one, is in penalizing exercise of the option of bottling at the distillery, in the case of imports only, while domestic distillers can do it without tax consequences, but the severity of this discrimination is not made clear in the reported cases. We may take judicial notice it is not sufficient to prohibit importation of spirits bottled below proof at foreign distilleries, and the GATT could not have been intended to demand the impossible task of eliminating even inadvertent and *de minimis* discriminations.

In the above wine-gallon proof gallon cases, the issue was whether an unambiguous Congressional command was discriminatory. Here it is whether an ambiguous command should be given a discriminatory or non-discriminatory interpretation. That is a wholly different question. Here we have a discrimination which cannot be avoided, if the Government is right, and which the importer convincingly establishes is prohibitive of importation.

The economic considerations of this problem are simply illustrated. The average total cost to the plaintiffs of importing a European tire carcass was $3, which included an original cost of $2 for the tire carcass itself. Plaintiffs'

average selling price was $3.50, which resulted in a gross profit of 50 cents and a net profit of 25 cents if the tax here in litigation was not applicable. A tire carcass weighing 20 pounds would, depending on the time period involved (see Finding No. 10), if taxable, bear a tax of $1.00, $1.60 or $2.00. The tax, therefore, would be equal to 50%, 80% or 100% of the cost to plaintiffs of the tire carcass itself. And, as a percentage of net profit the tax would be 400%, 600% or 800%. Since plaintiffs were advised that their imported tire carcasses were claimed to be subject to the excise tax imposed under § 4071(a) they have stopped the importation of the tire carcasses.

We note that it is not the practice of the Internal Revenue Service to assess any tax on the sale of domestic tire carcasses either before or after recapping. Its theory is that any tax obligation respecting such carcasses is satisfied if the original tire of which the carcass is the remnant was taxed upon its sale as new. However, the tax upon the new tire, with other elements of the original sale price, is for the most part, absorbed by the original user. The sale price of a domestic tire carcass is necessarily limited by the amount the recapper can afford to pay in view of his other costs and the market for the recap tire. The recap must compete with low grade new United States tires selling often under $10. These factors of necessity must hold the price of a domestic carcass to within a few cents of the untaxed but duty paid landed price of a similar import, more or less. It cannot include any amount specifically allocable to the excise tax and this tax cannot be in any material part passed on to the recapper. If the sale of an imported tire carcass is subject to the excise tax and the sale of a domestic tire carcass is not, the imported carcass is placed at a hopeless competitive disadvantage.

The Government is sufficiently sensitive to the charge of discrimination to try to refute it, and in fairness its argument must be considered. *Arguendo* it assigns to the domestic carcass to be recapped the proportionate part of the original tax on the tire new, on a per pound basis. It says the discrimination then would arise only if the import escaped a like tax. But this is sheer myth making, for it is manifestly impossible for the tax in such substantial part to be passed on to the recapper, in the case of the domestic carcass. The Government does not show any sales of domestic carcasses to recappers at prices reflecting inclusion of the tax, and it is impossible there should be any. The recapper can and does buy his carcasses at a price so low that most of the tax falls on the original user and is not passed on when he sells the carcass. But if the carcass importer is assessed the tax, that importer suffers a heavy loss and is speedily out of the import business, for the retreader will no more accept a passing on of the tax in the case of the import than in the case of a domestic tire. Hence the domestic carcass is on the market to all intents tax free, and the import to compete with it must be tax free too.

We may note that the discrimination the Congress intended to exist was that in the Tariff Act of 1930, par. 1537(b), as modified, after June 30, 1956, by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas.Dec. 150, T.D. 54108, a tariff of 10% *ad valorem*, 9½% effective June 30, 1956, 9% effective June 30, 1957, 8½% effective June 30, 1958.

The Government has conceded that imported carcasses which are the remnants of original United States manufactured tires are tax free. This appears to be even more unalloyed discrimination, for it is a large assumption that these tires when new paid any United States tax at all. Up to 1958 exported tires were exempt under Internal Revenue Code § 4225. This section was repealed in 1958 and a new § 4221 added by Public Law 85–859, 72 Stat. 1282. Section 4221 is more restrictive, but some tire exports

are still exempt, i. e., those to original equipment manufacturers for export.

The plaintiff thinks it necessary for us to hold, contrary to the Skinner case supra, that retreading is a "manufacture." Cf. Exchange Parts Company, Inc. v. United States, 279 F.2d 251, 150 Ct.Cl. 538 (1960). What is "manufacture" is a vastly complex question, made more complex here by the many years of Internal Revenue Service acquiescence in the *Skinner* holding. Congress has repeatedly re-enacted the tax on tires without indicating any wish for the retreader to be taxed as a "manufacturer," a position that would have had enormous consequences. We need not resolve this issue and do not do so.

Thus the statute does not answer the problem before us without ambiguity. We test the Government's construction against the standards the Congress set for itself. It wished this legislation to raise revenue, to impose a moderate burden, and to be non-discriminatory. As applied to imported tire carcasses, it produces no revenue, imposes a crushing burden, and is highly discriminatory. Therefore, we conclude, the national legislature did not intend to tax imported tire carcasses.

■ For the reasons given, the assessment of the excise tax on the sale of imported tire carcasses is incorrect, and plaintiffs are entitled to recover the tax assessed, with interest.

II. The Assessment of a Penalty Under Section 6651(a) of the Internal Revenue Code of 1954 for Failure to File a Return.

■ As to this question, no more need be said; since the imposition of the excise tax on the tire carcasses was incorrect, the plaintiffs had no duty to file excise tax returns. Accordingly, the penalty should not have been imposed. Having been assessed and paid, the penalty should be refunded, with interest.

COLLINS, J., took no part in the decision of this case.