**SARKES TARZIAN, INC.**

v.

**The UNITED STATES.**

No. 38–62.

United States Court of Claims.

July 16, 1969.

C. B. Dutton, Indianapolis, Ind., attorney of record, for plaintiff. L. M. Ponder, Dutton, Kappes & Overman, and Barnes, Hickam, Pantzer & Boyd, Indianapolis, Ind., of counsel.

Gilbert W. Rubloff, Washington, D. C., with whom was Asst. Atty. Gen. Johnnie M. Walters, for defendant. Philip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner George Willi with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 57(a). The commissioner has done so in an opinion and report filed on July 8, 1968. Plaintiff did not except to the commissioner's recommended conclusion of law but did except to certain of his findings and requested additional findings. Defendant disagreed with some of the commissioner's legal conclusions, requested that the court adopt the findings made by the commissioner and requested additional findings by the court. The case has been submitted to the court on oral argument of counsel and the briefs of the parties.

In connection with the trial commissioner's discussion of section 4220(2) of the 1954 Code (§ 3442(2) of the 1939 Code), "Exemption for Sales or Resales to Manufacturers," the court confines the opinion to go no further than the case before him and before us, i. e., a case in which the article (the tube) undergoes no physical or functional change by reason of being plugged into the tuner base (see finding 26). We do not now have before us, and do not consider, the applicability of that statutory provision to an article which is changed or worked upon by the vendee prior to being resold "in due course."

Since the court agrees with the commissioner's opinion, findings and recom-

mended conclusion of law, as hereinafter set forth, it hereby adopts the same, together with the above, as the basis for its judgment in this case.* Therefore, judgment is entered for plaintiff, with the amount of recovery to be determined pursuant to Rule 47(c) and defendant's counterclaim is dismissed.

## OPINION OF COMMISSIONER

WILLI, Commissioner:

This is a suit for refund of manufacturers' excise taxes that were imposed by deficiency assessments against plaintiff on tubes that it purchased from independent suppliers for use in the television tuners that it made and sold to manufacturers of entertainment-type television receiving sets.

Both the tubes that plaintiff bought and the television sets into which they ultimately found their way as components of the tuners that it sold, were taxable articles throughout the period in suit; October 1952 through August 1955.

Though sale of the tubes by the person who manufactures them is, in the first instance, made a taxable event by statute, complementary Code provisions may mitigate liability at that point, depending upon the use to which the otherwise taxable tubes are put by the buyer. As will be seen, the purpose of these related statutory provisions is the prevention of tax pyramiding; the imposition of successive excise taxes on the same article as it passes through several hands en route to its final destination as a part or component of a manufactured end product that is itself taxable by statute.

This case clearly illustrates a potential pyramiding situation. Here we have taxable tuner tubes that eventually become a part of a taxable television set. The *ad valorem* tax imposed on the set is measured by the price for which it is sold by the set manufacturer. To the extent that the set's selling price reflects costs that the manufacturer incurred in

purchasing component parts used in making it, excise tax is imposed on such components. Moreover, if an excise tax has already been imposed on any of such components at an earlier stage in the chain of manufacture or distribution, the imposition of another tax on the total sales price of the end product results not only in taxing the value of such components a second time but taxing, as well, the amount of tax earlier imposed on them. It is this multiple taxation and resultant compounding of tax, called "pyramiding," that Congress has always condemned and sought to avoid by the adoption of mitigating provisions such as those in the forefront of this case.

In defending this suit, the Government candidly acknowledges that if recovery is denied, double taxation of the tuner tubes will result. Its position is simply that the facts present here do not fit the legislation aimed at effectuating Congress' announced policy of preventing pyramiding. Furthermore, the Government asserts the correctness of this position is reinforced by the fact that although Congress legislated in 1955 to prospectively relieve the dilemma in which plaintiff finds itself here, it has consistently refused to grant such relief for prior periods.

Plaintiff, of course, disputes the above propositions and advances a variety of theories, both legal and equitable, on which it should prevail. Because it is concluded that on one of these theories plaintiff's position is well-taken as a matter of law, the remainder, with the exception of a limitations question will not be dealt with herein.

Before discussing the dispositive legal issues, a brief summary of the factual context is in order.

Though the plaintiff engaged in various activities related to the communications industry, this suit concerns only its operations as a supplier of tuners to various television set manufacturers.

All commercial television receiving sets include a separately constructed and

---

* The concurring opinion of NICHOLS, Judge, follows the opinion of the trial commissioner which has been adopted by the court.

identifiable tuning mechanism for sound and picture. It is comprised of a number of individual parts and wiring mounted on a metal frame or base that is generally referred to in the industry as a chassis. The principal parts in a tuner are an RF (radio frequency) amplifier, a mixer, and an oscillator. In addition, there are condensers, coils, tubes, and associated circuitry.

Functionally, a television tuner is that portion of the receiver that accepts the desired sound and picture signals from a connected antenna system and processes them into a standard and amplified intermediate frequency. The output of a television tuner is neither perceptible sound nor picture because the carrier wave on which the sound and picture signals are transmitted through the atmosphere, has not at that point been dissociated and dissipated. Demodulation (separation and elimination of the carrier wave) is accomplished in all television receivers by separate equipment that receives the output of the tuner.

In order to realize the economies of mass production, it is usual industry practice for television set manufacturers to purchase tuners from suppliers, such as plaintiff, rather than to manufacture them themselves.

The final step in the assembly line manufacture of television tuners is ordinarily that of alignment, i. e., the process of such minor adjustments as are necessary to correlate each of the various fixed positions of the tuner selector switch with the reception of the particular station (or channel) frequency to which it relates and to properly synchronize the related audio and video signals for each station setting on the selector.

Alignment is done by simulating the conditions under which the tuner will operate in a television set. This simulation requires the passage of particular electrical signals through the tuner. Since the tubes form a part of the circuitry through which the signals must pass, it is impossible to align a tuner without its full complement of tubes. Because the set manufacturers are only interested in buying tuners that have already been aligned, the tuners supplied by vendors, such as plaintiff, customarily include a complete set of installed tubes.

As to the manufacturers' excise tax aspect of its tuner operations, plaintiff handled its affairs in essentially the following manner.

Until February 1955, when it first received a contrary indication from the Internal Revenue Service in the course of a routine field audit, plaintiff assumed that its tuners were taxable as the "chassis" referred to in 1939 Code, section 3404,[1] and later in 1954 Code, section 4142, defining taxable "television components" as including "chassis." Operating under this assumption, plaintiff purchased its tube requirements on a tax-free basis. In so doing, it issued its tube suppliers exemption certificates of the type authorized by regulations issued pursuant to the essentially identical 1939 and 1954 Code provisions which authorize a maunfacturer of taxable articles that include or contain components that are themselves taxable to purchase such components on a tax-free basis; sections 3442(1) and 4220(1), respectively. By such certificates, plaintiff assured its suppliers that the tubes purchased tax-free from them would be used by it as a component part of a taxable article,

1. "There shall be imposed upon the following articles (including in each case, except in the case of musical instruments, parts or accessories therefor sold on or in connection with the sale thereof) sold by the manufacturer, producer, or importer a tax equivalent to 10 per centum of the price for which sold:

"(a) Radio receiving sets, automobile radio receiving sets, television receiving sets, automobile television receiving sets, phonographs, and combinations of any of the foregoing. * * *

"(b) Chassis, cabinets, tubes, speakers, amplifiers, power supply units, antennae of the 'built-in' type, and phonograph mechanisms, which are suitable for use on or in connection with, or as component parts of, any of the articles enumerated in subsection (a), whether or not primarily adapted for such use. * * *"

*i. e.*, a tuner. It is undisputed that plaintiff was entitled to buy its tube requirements free of tax under this procedure if the tuners that it sold are regarded as taxable articles.

Throughout the period in suit, plaintiff's customers, the set manufacturers, were issuing it certificates similar to those described above, in connection with their purchases of tuners on a tax-free basis. Their certificates represented, and correctly so, that the tuners were to be used in the manufacture of a taxable article—a television set. It is agreed by all concerned that this procedure was proper, and it is not suggested that plaintiff should have collected and paid over any tax on sales of its tuners even though they included taxable tubes.

After receiving the indication from Internal Revenue in 1955 that its tuners might not be considered taxable, plaintiff continued buying tubes tax-free and issuing its suppliers exemption certificates of the type previously described. In addition, however, on each purchase it issued a second exemption certificate—a certificate authorized by the regulations under subparagraph (2) of sections 3442 and 4220 of the 1939 and 1954 Codes, respectively.

As previously noted, subparagraph (1) of these sections deals with the situation where a manufacturer of taxable articles purchases components that are themselves subject to tax. In complementary fashion, subparagraph (2) comprehends a purchase of taxable components by a person for resale to a manufacturer of the type described in subparagraph (1). Thus, in this second type of certificate that plaintiff issued its suppliers it represented that it was buying the tubes in question solely for resale to a vendee who would use them as material in the manufacture of a taxable article—a television set. According to the Government, plaintiff improperly issued these certificates because it was not a dealer in tubes but a manufacturer of tuners that included tubes. As will be seen, the Government is incorrect in this contention.

The situation as to plaintiff's filing of federal excise tax returns and the Government's deficiency assessments thereon is basically as follows.

The format and details of each of plaintiff's returns for the period in suit, October 1952 through August 1955, are set forth in findings 9 through 12 of the findings of fact accompanying this opinion.

For present needs, it suffices to note that the monthly returns filed by plaintiff's Batavia, Illinois, plant for October, November, and December 1952, related to other taxable articles and made no mention of either the tubes or tuners involved in this litigation.

Though plaintiff made some of the tuners involved in this litigation at Philadelphia, Pennsylvania, the bulk of them were made in its headquarters plant in Bloomington, Indiana.

After 1952, plaintiff filed its excise tax returns on a quarterly rather than a monthly basis.

On approximately February 1, 1954, plaintiff filed a delinquent return for each quarter of 1953. These returns, as well as the timely returns filed thereafter for each calendar quarter through August 1955, declared the value of all tuners and tuner tubes sold by plaintiff but showed no tax due thereon because in all instances the sales were made pursuant to exemption certificates issued plaintiff by the set manufacturers, as previously noted herein.

In June 1957, the Commissioner of Internal Revenue assessed deficiencies against plaintiff totaling $115,461.70 for the first 3 months of 1953 and $447,813.-41 for the last quarter of 1952 and all quarters from April 1, 1953 through August 31, 1955.

Plaintiff paid the $115,461.70 deficiency in full but has paid no part of the $447,813.41 for which the Government has counterclaimed but agreed to refrain from collecting, pending a final adjudication of the merits of this suit.

Plaintiff duly filed a claim for refund of its deficiency payment and after the

claim was formally disallowed, the present action was commenced.

■ As previously noted, among plaintiff's various contentions is one based on the bar of limitations. Specifically, plaintiff asserts that certain of the underlying assessments involved in this action were made too late.

The claim of untimely assessment, which is without merit, is not directed to the suit at large but only to the last quarter of 1952 and the first 4 months of 1953.

Timeliness of the challenged assessments is governed by section 3312 of the 1939 Code. In substance, it provides generally that manufacturers' excise taxes shall be assessed within 4 years of their becoming due. The 4-year period is extended indefinitely, however, in the case of a false or fraudulent return or where there has been a failure to file the requisite return within the time required by law.

All taxes involved in this suit were assessed on June 14, 1957. Concededly, this was more than 4 years after filing of the monthly returns for October, November, and December 1952. The Government urges, and properly, that the assessments relating thereto were nonetheless timely because of the failure to file return exception to the general 4-year-time limitation on assessment.

The three monthly returns on which plaintiff relies to invalidate the assessments for 1952 related solely to operations at its Batavia, Illinois, plant. As reflected in finding 9, *infra*, that plant was not at all involved in the tuner business and, hence, the returns in question bore no reference to either tuners or to the tubes related to them.

In People's Outfitting Co. v. United States, 58 F.2d 847, 851, 74 Ct.Cl. 419, 427 (1932), this court considered precisely the limitations argument that plaintiff urges here and held as a matter of law that in the excise tax area, transactions omitted from a return, even though they occurred duing the period covered by the return, may be the sub-

ject of an assessment at any time. To the extent of such omitted transactions, the court held, the taxpayer had failed to file a return.

The fundamental premise underpinning the limitations holding in *People's Outfitting, supra,* is that the incidence of excise taxes falls separately and independently on each taxable transaction. See McDonald v. United States, 315 F.2d 796, 800 (6th Cir. 1963); Jones v. Fox, 162 F.Supp. 449, 455 (D.Md.1958); and Cory Corp. v. Sauber, 363 U.S. 709, 80 S.Ct. 1331, 4 L.Ed.2d 1508 (1960), where the Court was considering the taxability of a single household-type air conditioner.

The parties agree that plaintiff's suppliers filed returns that encompassed the tuner tubes sold plaintiff under the exemption certificates that it issued. (Finding 7, *infra.*) As an additional argument directed to the last 3 months of 1952 and as to the first 4 months of 1953, plaintiff urges that the assessments against it are invalid because made more than 4 years after filing of the suppliers' returns. This contention is without merit because, in view of the exemption certificates issued by plaintiff, the taxable event was not the sale by the suppliers but the use to which the tubes were put by plaintiff after it bought them. The suppliers' returns, of course, made no mention of their customers' use of articles purchased.

Accordingly, it is concluded that all assessments involved were timely. Thus, if plaintiff is to recover at all, it must do so on the merits.

■ In the forefront of the assorted legal and equitable theories advanced by plaintiff are two related legal contentions that are dispositive of the merits of the case. They rest on the statutes in reliance on which plaintiff issued its tube suppliers the two types of tax exemption certificates previously discussed.

Throughout the period in suit the companion mitigation provisions authorizing the tax-free purchase, in prescribed circumstances, of otherwise taxable articles were contained in section 3442(1) and

(2) of the 1939 Code and its substantially identical successor, section 4220(1) and (2) of the 1954 Code. In relevant part the latter section, captioned EXEMPTION FOR SALES OR RESALES TO MANUFACTURERS, provides:

Under regulations prescribed by the Secretary or his delegate, no tax under this chapter shall be imposed with respect to the sale of any article—

(1) for use by the vendee as material in the manufacture or production of, or as a component part of, an article enumerated in this chapter;

(2) for resale by the vendee for such use by his vendee, if such article is in due course so resold.

The first proposition urged by plaintiff, and the one to which the bulk of both sides' trial efforts were directed, is that its tuners (in which the tubes were used) were taxable as the "chassis" described in 1939 Code, section 3404, and its successor provisions, sections 4141 and 4142 of the 1954 Code. See n. 1, *supra*. Accordingly, plaintiff says, since it was a manufacturer of a taxable article it was entitled to purchase the necessary tubes under subsection (1) of the statute quoted above.

While both sides agree that a tuner may be a "chassis," they part company as to the functional characteristics and capabilities that a tuner must have in order to fit the quoted statutory term. Specifically, the dispute is whether demodulation—the ability to produce listenable sound—is among the requisite functional capabilities, the Government arguing the affirmative and the plaintiff the negative. The parties marshalled respectable expert opinion supporting both sides of that issue. The conflicting testimony and other evidence adduced do not reveal any settled understanding, in either the communications industry or among the general public, as to whether a tuner without demodulation capability is nonetheless a "chassis." Equally unclear, as applied to a tuner, is what Congress intended to cover by using the term "chassis" in 1932 when it first imposed manufacturers' excise taxes on various enumerated radio components, and in 1950 when it applied the same treatment to television sets.[2] Finally, although the Revenue Service periodically issued rulings and regulations defining "chassis" as used in the taxing statutes, it was not until 1958, well after the period here in suit, that the Service expressly declared that only a tuner that performs the demodulation function is a taxable "chassis." Rev.Rul. 58–27, 1958–1 Cum.Bull. 414. The parties agree that television tuners generally, including those in suit, do not perform that function.

In view of the basically equivocal state of both the factual record and the applicable law on the question of whether plaintiff's tuners are taxable as "chassis," thereby entitling it to purchase tuner tubes tax-free under the provisions of sections 3442(1) and 4220(1) of the respective Revenue Codes, it is held that plaintiff has not met its burden of proof and therefore may not prevail on this theory of eligibility for tax-free tube purchase. In short, for purposes of this decision plaintiff's tuners are regarded as not taxable, as the Government contends.

The fallacy in the Government's defense emerges when you accept its central premise that the tuners are nontaxable and apply that premise to the related question of plaintiff's right to purchase tubes tax-free under subsection (2) of sections 3442 and 4220. That provision, previously quoted, says in effect that one may buy a taxable article free of tax provided that he is buying it for resale to a person who uses it as material in the manufacture or production of an end product that is taxable.

As its first alternative contention plaintiff asserts, and correctly, that it comes within this companion mitigation provision as one who bought tubes for

2. Sec. 605, Revenue Act of 1950, ch. 994, 64 Stat. 906.

resale to manufacturers of taxable articles—television sets.

The Government says that plaintiff does not qualify under that provision because it did not purchase the tubes in question as a dealer who was simply reselling them to set manufacturers. Because the plaintiff purchased the tubes for use in its manufacture of tuners, the argument goes, its legal status in relation to those tubes was that of a manufacturer. According to the Government, one who performs a manufacturing operation on a purchased taxable component cannot buy it tax-free under the provisions of subsection (2) which, it insists, applies only to dealers.

The difficulty with the Government's position is two-fold. First, it is far from clear as a matter of law that where a taxable component is in fact ultimately resold to a taxable end-product manufacturer, the availability of the tax-free purchase privileges of subsection (2) to the intermediate seller is conditioned upon what he does with the component while it is in his possession. Second, even if such privileges are deemed unavailable to an intermediate manufacturer, this plaintiff is not disqualified because, under the Government's own view, plaintiff was not a "manufacturer" of tuners as that term is clearly defined for purposes of the manufacturers' excise tax. That definition, it will be seen, presupposes taxability of the product produced by the act of manufacture. If the resulting product is nontaxable, as the Government insists with respect to the tuners, then "manufacture" has not occurred. This is true no matter how sophisticated and extensive, in the functoinal sense, the operations performed to produce the product.

The Government bases its contention that plaintiff was a manufacturer of tuners primarily on an excerpt from a 1932 House Committee Report and on a long-standing Treasury Regulation, apparently based on that Report language, defining a manufacturer for purposes of the excise tax. On analysis, these materials prove plaintiff was not a manufacturer in any sense that is relevant to its eligibility for tax-free purchase privileges.

Our present system of manufacturers' excise taxes originated in the Revenue Act of 1932, ch. 209, 47 Stat. 169.

It is important to recognize that the Committee Bill, to which the Report relied on by the Government relates, differed fundamentally in scope from the legislation ultimately enacted.

As disclosed by the Report, H.Rep. No. 708, 72d Cong., 1st Sess. (1939–1 Cum.Bull. (Part 2) 457,463), the Committee Bill called for a general manufacturers' excise tax of 2¼ percent "of the sale price * * * of every article sold in the United States by the manufacturer or producer thereof." Under this approach all manufacturers were to be licensed and sales between licensed manufacturers made tax-free. See Secs. 601 and 606 of H.R. 10236, 72d Cong., 1st Sess. as reported out by the Ways and Means Committee on March 8, 1932.

In its Report the Committee listed "six fundamental tests" that it felt must be met in a manufacturers' excise tax bill. The third among these was that: "Pyramiding must be prevented." 1939–1 Cum.Bull. (Part 2) at 479. With respect to its Bill meeting this requirement the Committee explained (at 480):

> The imposition of several taxes with respect to any article, commonly referred to as pyramiding, is effectively eliminated under the bill by a system of licensing. All manufacturers and producers (other than those whose gross receipts are less than $20,000) must be licensed. The bill then permits the sale of articles tax free from one licensee to another. Thus, the product of one manufacturer which is to be used as a material by a second manufacturer, passes through all stages of manufacture without the imposition of a tax. *In this manner the tax is imposed but once—upon the final sale as a finished product enter-*

*ing the channels of consumption.* [Emphasis added.]

Section 617 of the Committee Bill was devoted entirely to definitions. Among the statutory terms defined was "manufacture or produce." Regarding this term the Committee stated as follows (1939–1 Cum.Bull. (Part 2) at 487):

Subsection (e) is intended to give the broadest possible scope to the term "manufacture or produce," so that no one processing or manipulating an article, no matter how slightly, will escape classification as a manufacturer or producer. * * *

This is the language on which the Government erroneously relies for the definition of "manufacture" that it urges in relation to the selective, and therefore basically different, taxing statutes involved in this suit.

Notably, under the general excise levy provided in the House Bill, taxability of any article was made to depend solely on what the seller had done with it in the physical or functional sense. Plaintiff's tuner operations would unquestionably have amounted to an act of manufacture. It is equally clear, however, that because of the licensing feature of the Bill, plaintiff could have purchased tubes tax-free and sold its tuners free of tax. Under the Bill it would have been the television set manufacturer who made the first and only taxable sale.

The Committee Bill underwent extensive floor debate. See 75 Cong.Rec. 5384, 5461, 5689, 5692–93, 5697, 5787, 5789, 5888–5904, 6158, 6163, 6337–6360, 6469–6684 (1938). Aside from general hostility to a sales tax in principle, there was a stated preference for a tax on selected articles, such as automobiles, refrigerators, radios, etc. rather than the general tax proposed by the Committee. Finally, a motion to strike the Committee's entire manufacturers' excise proposal was made and passed. 75 Cong. Rec. 6686, 6816 (1938). Following this action the Committee responded with a selective excise tax bill that closely resembled the version finally adopted. Be-

cause of the exigencies of time, no further report was issued.

Though the selective excise taxes provided in the Bill passed by the House were imposed at the manufacturers' level, the act of manufacture was no longer the touchstone of liability. No matter how much manufacturing an article underwent, its sale by the manufacturer was not taxable unless it was one of the articles specifically enumerated in the Bill. For liability purposes, then, the issue of whether manufacturing had occurred only became relevant if the article sold was of a type described in the statute. This principle is recognized in the Treasury Regulation defining a "manufacturer" for purposes of the taxing provisions involved in this suit. Treasury Regulation 46, § 316.4 (1940), provides:

*Who is a Manufacturer.*—(a) The term "manufacturer" includes a person who *produces a taxable article* from scrap, salvage, or junk material, as well as from new or raw material, (1) by processing, manipulating, or changing the form of an article, or (2) by combining or assembling two or more articles. [Emphasis added.]

Thus, it is seen that the Treasury Department has itself declared that only one *who produces a taxable article* is a manufacturer for purposes of the manufacturers' excise tax. Curiously, the defendant relies heavily on the quoted regulation to support its contention that plaintiff is a "manufacturer." For reasons unknown, however, it overlooks the significance of the underscored taxability language.

Consistent with the teaching of the Regulation, excise tax litigation centering on the issue of whether one is a manufacturer has always arisen in the context of production of a taxable article. See, for example, Williams v. Harrison, 110 F.2d 989 (7th Cir. 1940); Charles Marchand Co. v. Higgins, 124 F.2d 433 (2d Cir. 1942).

Accordingly, the Government's contention that plaintiff could not utilize the

tax-free purchase privileges of sections 3442(2) and 4220(2) because it was a manufacturer of tuners is without merit. It may be a manufacturer in the general sense, *e. g.*, Anheuser-Busch Brewing Assn. v. United States, 207 U.S. 556, 560–562, 28 S.Ct. 204, 52 L.Ed. 336 (1908), but in the special and limited context of the manufacturers' excise tax it clearly is not because, as previously seen, it is not "a person who produces a taxable article" as provided in Treas. Reg. 46, § 316.4, *supra*.

The progenitor of these intermediate sale provisions was added to the law as section 4 of the Act of June 16, 1933, ch. 96, 48 Stat. 254, amending section 620 of the Revenue Act of 1932. The action was taken to more fully effectuate fixed Congressional policy against pyramiding. H.Rep.No. 45, 73d Cong., 1st Sess., S.Rep.No. 58, 73d Cong., 1st Sess. (1939–1 Cum.Bull. (Part 2) 883–84).

The sole and obvious purpose in adopting section 620 of the Revenue Act of 1932, as amended, which eventually became section 3442 of the 1939 Code, and finally section 4220 of the 1954 Code, was the avoidance of pyramiding. Companion subsections (1) and (2) of those sections achieve this result by providing that, if an article including taxable components is sold to a manufacturer of a taxable end product, the components purchased by the intermediate supplier are not subject to the payment of tax by him. If the article that he sells the end-product manufacturer is itself taxable, his tax-free purchase privileges are conferred by subparagraph (1). If the product

that he sells is nontaxable, such privileges come from subparagraph (2).

In sum, if plaintiff's tuners are taxable, it was entitled to buy tubes tax-free under subsection (1). If they are not, it was entitled to do so under subsection (2).

The Government's further suggestion that plaintiff's standing in relation to the anti-pyramiding provisions should be fixed by what it termed itself (*i. e.*, a manufacturer) in some of the exemption certificates that it issued its tube suppliers, is also without merit. The regulations recognize the notice-giving (rather than substantive) character of the certificates by providing that even if no certificate is issued at time of purchase, the buyer is nonetheless entitled to tax-free purchase privileges if he in fact comes within either of the anti-pyramiding statutes. Treasury Regulations on Manufacturers and Retailers Excise Tax (1954 Code), §§ 40.4220–3(b) and 40.4220–4(b).

Finally, the Government urges that the adoption of Public Law 367, ch. 805, 69 Stat. 689, on August 11, 1955, demonstrates that theretofore, and specifically during the period in suit here, plaintiff and others similarly situated could not purchase tuner tubes free of tax. The legislation relied on does not bear out this contention.

The enactment in question, effective prospectively only, restructured 1954 Code, section 4220, by retaining the previous provisions of that section in subsection (1) and adding the new matter in subsection (2).[3] The added provi-

---

3. As amended, section 4220 provides:
   "Under regulations prescribed by the Secretary or his delegate, no tax under this chapter shall be imposed with respect to the sale of—
   "(1) any article (other than an automobile part or accessory taxable under section 4061(b), a refrigerator component taxable under section 4111, a radio or television component taxable under section 4141, or a camera lens taxable under section 4171)—

"(A) for use by the vendee as material in the manufacture or production of, or as a component part of, an article enumerated in this chapter; or

"(B) for resale by the vendee for such use by his vendee, if such article is in due course so resold; or

"(2) an automobile part or accessory taxable under section 4061(b), a refrigerator component taxable under sec-

sions were not intended to deal with situations of the type presented in this case.

■ As previously shown, a fundamental policy of manufacturers' excise tax legislation has always been to impose the levy on the sale that is made at the final point of manufacture when the article enters the channels of consumption. In formulating the provisions necessary to achieve this policy objective, Congress recognized that there would be situations where the taxable end product included various components that the end-product manufacturer obtained from independent vendors. To the extent that such components either included taxable articles or were themselves taxable articles, an imposition of tax on the intermediate sales to the end-product manufacturer would result in multiple taxation when the same articles were again taxed as a part of the end product sold by the final manufacturer. The original provisions of section 4220 were the means selected by Congress to insure against this multiple taxation of the same article, first as a component and again as a part of a finished product. Thus, these provisions were designed to function solely in relation to. the production of end products made taxable by statute.

In 1955, however, Congress became aware of a completely different problem, i. e., the situation where components made taxable by statute were bought by the final manufacturer and used by him to produce an end product that was not taxable.

In their Reports, H.Rep.No. 1308, 84th Cong., 1st Sess.; S.Rep.No. 1162, 84th Cong. 1st Sess. (1955–2 Cum.Bull. 881, 884, the Ways and Means and Finance Committees carefully explained both the background and purpose of the new legislation.

First, they noted that under existing law tax is imposed on taxable components even though the consumer product in which they are ultimately used is nontaxable. The only statutory exception to this result, the Committees observed, was in the case of components used to manufacture refrigerators. The Committees added, however, that by an old administrative ruling the Revenue Service had accorded similar treatment in the case of certain automotive parts and accessories.

In the light of this background, the Committees felt that legislation was needed to provide a single and uniform rule applicable to taxable components used in making nontaxable end products. Such legislation would also remove existing tax inequalities between two components that competed in the market place, though one might be made from taxable articles while the other was not.

After enumerating these various considerations, the Committees stated the basic policy objective of the new legislation (1955–2 Cum.Bull. 883, 885) as follows:

> * * * Providing for tax-free sales where the end products are not taxable also will prevent the indirect taxation of articles which Congress has not considered it desirable to subject to direct excise taxation. * *

In sum, whereas the concern of the prior provisions of section 4220 was that a single manufacturers' excise tax would

---

tion 4111, a radio or television component taxable under section 4141, or a camera lens taxable under section 4171—

"(A) for use by the vendee as material in the manufacture or production of, or as a component part of any article; or

"(B) for resale by the vendee for such use by his vendee, if such article is in due course so resold.

For purposes of this chapter, the manufacturer or producer to whom an article is sold under paragraph (1) (A) or (2) (A) or resold under paragraph (1) (B) or (2) (B) shall be considered the manufacturer or producer of such article. The provisions of paragraphs (1) and (2) shall not apply with respect to tires, inner tubes, or automobile radio or television receiving sets taxable under section 4141."

be imposed and collected only upon the sale of a taxable finished article entering consumption channels, the object of the 1955 amendment was to altogether prevent the collection of tax upon any sale of any article, taxable or not, if its ultimate use was in the manufacture of an end product that was nontaxable. In both instances the controlling consideration is the taxability of the end product that results after all manufacturing is done. If that product is taxable, all of its constituent components are taxed only once. If it is nontaxable, the components used to make it are not taxed at all. It is unwarranted to read more than this into the 1955 enactment. In any event, the legislative history rules out the notion that the added provisions were intended to apply to situations such as that in suit, where the end product into which all components ultimately merge is a taxable article, i. e., a television set. The amendment would have been relevant had plaintiff been buying taxable articles and using them to make components that were in turn used by its vendees in the manufacture of nontaxable end products.

Accordingly, nothing that occurred in 1955 detracts from the conclusion that prior thereto plaintiff was entitled to purchase tuner tubes tax-free because the tuners were sold to manufacturers of taxable television sets. The full measure of manufacturers' excise tax liability was imposed and collected upon the total price for which the manufacturers sold the sets. The law does not permit, much less require, that the Government, having received and retained that tax in full, now go back and collect a second tax on the tuner tubes.

Judgment should be entered for plaintiff, with the amount thereof to be determined under Rule 47(c), and defendant's counterclaim should be dismissed.

NICHOLS, Judge (concurring):

I am happy to concur in the court's *Per Curiam* opinion adopting Commissioner Willi's eminently satisfactory handling of this case. I would like to add a few comments to explain my own views.

To all appearances, the defendant's position is lacking in merit to a degree which is unusual among the tax cases that come to this court. This is because the principles of statutory construction applicable herein have suffered disregard of a kind which defendant's taxing authorities are rarely guilty of.

At the outset, I would like to point out that this is the 3rd case argued within a two months' span in which defendant's counsel has candidly acknowledged that he is unable to suggest a single reason why the Congress should have wished to enact into law the statutory construction defendant urges. The other two cases are Jones v. United States, No. 146–48, disposed of by order, May 19th, 1969 (a pay case); and United States v. Native Village of Unalakleet et al., Ct. Cl., 411 F.2d 1255 (decided June 20th, 1969). I should think that realization of this might give rise to a doubt whether one is well armed for forensic combat. Commissioner Willi rightly points out that defendant's position would "pyramid" the tax on tubes used in plaintiff's tuners (i. e., tax them twice), contrary to the standards of sound excise tax legislation the Congress had prescribed for itself. He might have also pointed out that the defendant's interpretation is highly discriminatory. It was admitted in oral argument that some television tuners were made by integrated manufacturers of television sets and that RCA was in this category. It was further admitted that there would be no pyramiding or double taxation, under the defendant's interpretation, on the tubes that RCA might have used in the production of tuners. The majority of the concerns which produce tuners are not integrated into great business combines and are independent, selling their product at arm's length to the ultimate manufacturer of the television set, as plaintiff does or did. Thus defendant imputes to

Congress an intent to discriminate in favor of the corporate giant against the small independent producer. In Select Tire Salvage Co., Inc. v. United States, 386 F.2d 1008, 181 Ct.Cl. 695 (1967), this court considered the same Congressional excise tax standards that Commissioner Willi refers to and noted that they also include a policy against such discrimination.

Defendant forgets that the intent of Congress must be our lodestar, and that any statutory construction necessarily imputes an intent to Congress. If Congress didn't intend it, the statute doesn't do it. Defendant would make Congress a mere blunderer incapable of drafting legislation to effectuate its own declared policies. Of course, everyone knows that once in a great while the Congress may be obstinate in error and rivet together a misshapen structure the IRS and the courts cannot get out of. That is not this case. In this instance the language is so weak in supporting defendant's position that it includes 4 escape hatches, each one large eonugh for a person of normal girth. There is, to begin with, no such certainty about the meaning of the word "chassis" as to justify interpreting it to exclude its application to plaintiff's tuners. (I differ with the commissioner so far as he throws on plaintiff the burden of resolving this ambiguity.) In the second place, there is no certainty that the exemption cited by the commissioner "for resale by the vendee for such use by his vendee, if such article is in due course so resold" does not include articles such as the tubes here involved which are not physically attached to the plaintiff's tuners but are only plugged into sockets. In the third place, as the commissioner points out, even if (contrary to fact) the tubes were physically incorporated in the tuners and could not be removed without damage, there is no compelling reason for holding that the plaintiff is a "manufacturer" under the statute and regulations applicable. In the fourth place, it appears possible to me to hold that the articles "for use by the vendee as material in the manufac-

ture or production of, or as a component part of, an article enumerated in this chapter;" includes use in assembling a component part which is afterwards built into a "taxable article" by another person. Any one of these 4 openings make it possible to preserve the reputation of Congress for ability to draft non-discriminatory and non-pyramiding excise tax legislation when it intends to do so.

I myself and, I believe, some of my colleagues, were anxious to obtain a better understanding of how the administrative decision was arrived at, so that we could make a selection among the 4 escape hatches that would not have unforeseen results in other situations. Counsel for defendant indicated that a decision against him would have such results but failed to furnish specifics.

Having been at one time a member of the Treasury bureaucracy myself, I feel I understand somewhat the rationale of seemingly, but perhaps only seemingly, indefensible decisions such as this. The official tends to consider any specific problem in light of a vast structure of administrative rulings, published and unpublished, and court decisions. The relation of many parts to the situation at hand is concealed from the uninitiate, but obvious to him. Any proposed position is considered according to whether it would shore up or weaken this fabric. This often has a larger share in his thinking than the intent of Congress or achieving justice and equity under law for the individual taxpayer. On the other hand, the adversary system of justice tends to focus the attention of courts on the immediate issue before them and they are often—with the best will in the world—oblivious of much or all of the broader conceptual problems. For this reason courts often seem to the technical officials like hyperactive children ignorantly and innocently dealing destruction all around them. The officials often seem to courts as persons bent on the perpetuation of injustice. Each side

needs a better understanding of the other's problems and point of view.

The adversary system tends to conceal rather than disclose the reasoning and background that underlies administrative decisions. The less the plaintiff knows about how the decision he is challenging was made, the less effective he will be in proving it wrong. This, of course, is one reason for the pressure by plaintiffs to gain access to unpublished private rulings and for the opposition to this by the defendant.

In this case, there was some probing into unpublished private rulings. See Finding 28. The plaintiff sought to show administrative discrimination under the doctrine of International Business Machines Corp. v. United States, 343 F.2d 914, 170 Ct.Cl. 357 (1965). The commissioner did not base his decision on this, nor do we, though the story of the Treasury's hesitations and vacillations is of interest. Eventually we are going to have to firm up a position about the proper use of private rulings issued to persons not parties to the litigation actually before us. Distressing as it is to defendant to go into this material, at times it may furnish the illumination needed. At times, no doubt, it is irrelevant and useless. What is really wanting here is knowledge as to why the IRS handled the taxpayer as it did, not whether it handled him the same as others similarly situated.

In most judicial reviews, courts have the benefit of the thinking of the officials whose decision is being reviewed. In tax and custom litigation, often they do not. I have protested recently against deciding tax cases with blinders on. Inter-City Truck Lines v. United States, 408 F.2d 686, 187 Ct.Cl. 290 (decided March 14, 1969, dissenting opinion). I do not think I have blinders on here, but I do have some consciousness of imperfect vision. When will defendant assume the onus of educating the court about its decisions, instead of keeping it in the dark?