**BARNEBEY–CHENEY CO., Appellant,**

v.

**The UNITED STATES, Appellee.**

**Customs Appeal No. 5510.**

United States Court of Customs
and Patent Appeals.

Nov. 21, 1973.

Markey, Chief Judge, dissented and
filed opinion in which Rich, J., joined.

Allerton deC. Tompkins, New York
City, atty. of record, for appellant.

Irving Jaffe, Acting Asst. Atty. Gen.,
Andrew P. Vance, Chief, Customs Section, Glenn E. Harris, New York City,
for United States.

Before MARKEY, Chief Judge, and
RICH, BALDWIN, LANE and MILLER, Judges.

MILLER, Judge.

This appeal is from the judgment of
the United States Customs Court, First
Division, 68 Cust.Ct. 98, C.D. 4343
(1972), overruling appellant's protest
against the classification under paragraph 69 of the Tariff Act of 1930, as
modified by T.D. 54108, of imported
merchandise consisting of *spent* activated carbon salvaged in Great Britain
from canisters of gas masks. We reverse.

The referenced paragraph provides as
follows:

Decolorizing, deodorizing, or gas-absorbing
chars and carbons,
whether or not activated, and all activated
chars and carbons ..... 19% ad val.

Appellant claims that the merchandise
was properly classifiable under para-

graph 1555 of the Tariff Act of 1930, as modified by T.D. 52739, which provides as follows:

Waste, not specially pro-
vided for ............ 4% ad val.

### FACTS

The merchandise in question was sold to appellant by J & J Maybank, Limited, which had purchased the gas masks from the Ministry of Supply. Some of the masks had been in storage since 1936 and the latest were 1945 manufacture. Maybank invented a machine to open the canisters to release the charcoal they contained through a screen into burlap sacks for storage and shipment. Small slivers of metal and bits of fabric from the canisters also came through the screen and were contained in the imported charcoal, which originally had been impregnated with various metallic salts of copper, silver and chromium (to improve its capacity for military gases). Appellant introduced evidence that the charcoal contained moisture from rain and snow due to open storage of the masks. The Customs Court found it to be "clear" that upon entry the merchandise "had a sufficiently high absorbed moisture content, i. e., 20 percent, to be regarded as 'spent' activated charcoal."

Questioning of one of appellee's expert witnesses by the court below brought out the distinction between spent activated charcoal and activated charcoal, namely: that spent activated charcoal is no longer, as such, without further treatment, capable of adsorption.

Testimony by another of appellee's witnesses with respect to tests made in Customs Service laboratory disclosed that activated carbon purchased from a chemical supply house had an adsorbent capacity of 50 to 60 percent, while a representative sample of the merchandise in question (following a heating and drying process) had an adsorbent capacity of 21.9 percent.

In tendering the masks, the British government advised as follows: "CHARCOAL WHICH MAY BE RECOVERED FROM BREAKDOWN OF THE RESPIRATORS MAY NOT BE USED FOR THE PRESERVATION OF FOODSTUFFS OR THE PURIFICATION OF WATER." The invoices covering the merchandise shipped from Maybank to appellant contained the description: "Scrap Charcoal From Gas Masks."

Appellant introduced evidence that the merchandise was used as "raw material" for the production of a low grade of unspent activated carbon. Its process of "regeneration," "rejuvenation," or "revivification" consisted of burning out absorbed material at high temperature under steam, with some of the carbon being leached to remove the metallic salts. The resulting product was sold as a deodorizer for diaper pails and refrigerators, for testing of the gasoline content of natural gas, and (after grinding) as an ingredient for decolorizing dry cleaning solvent. In its "raw" state, the merchandise was not commercially suitable for any specific purification application.

### THE ISSUE OVER WHAT THE CLASSIFICATION WAS

The record clearly shows that the Deputy Collector of Customs, in his reports dated February 7, 1964, (filed with the U. S. Customs Court February 10, 1964), on the various protests involved herein classified the merchandise in question as "non-activated decolorizing, deodorizing, or gas absorbing carbon," although by letter dated January 20, 1960, from the Chief, Division of Classification and Drawbacks, appellant was advised that in the opinion of the Bureau of Customs the merchandise was classifiable "under the provision for decolorizing, deodorizing, or gas absorbing carbons and chars, whether or not activated." The government (appellee), on the other hand, argues that in its opening statement before the U. S. Customs Court it made it clear that it was supporting the classification as "a gas absorbing carbon or an activated carbon" and that this statement was not disputed

by appellant during the trial. The government further argues, without citation of authority, that the main purpose of the Customs reports was to indicate the paragraph, rather than specific language within the paragraph, under which the merchandise under protest was classified.

## THE ISSUE OVER THE WORD "ABSORBENT"

The parties have devoted considerable argument over whether the Congress intended *ad*sorbent carbons to be included when the word *ab*sorbent was used in paragraph 69. The Summary of Tariff Information, 1929, which was compiled by the U. S. Tariff Commission and printed for use of the Committee on Ways and Means of the House of Representatives, described decolorizing and deodorizing carbons as activated by special processes so that they are capable of *ab*sorbing much greater quantities of coloring matter than ordinary charcoal or bone char. (Vol. 1, p. 334.) The conclusion could thus be drawn that "absorbent" was used by Congress in a nonscientific sense to include carbons having *ad*sorbent qualities. On the other hand, the principal testimony during the hearings before the Ways and Means Committee stated that activated carbons have superior decolorizing, deodorizing, and *ad*sorptive properties. Hearings on Tariff Readjustment—1929 Before the Committee on Ways and Means, House of Representatives, 70th Cong., 2d Sess., Vol. I, p. 805 (1929). Accordingly, it could be argued that the distinction between *ab*sorbing and *ad*sorbing had been brought to the attention of those who drafted the legislation and that both words would have been used if it had been intended to include both types of carbons.

## OPINION

As will appear below, we do not believe it necessary to decide the above issues. Taking the government's classification, as set forth in its opening statement before the U. S. Customs Court,

namely: "a gas absorbing carbon or an activated carbon," and assuming that the word "absorbing" was intended to include "adsorbing," the question is whether or not Congress, in its enactment of paragraph 69, intended to reach merchandise consisting of *spent* activated carbons possessing no commercial use except as a raw material.

A study of the legislative history of paragraph 69 of the Tariff Act of 1930 discloses that the one witness before both the House Ways and Means Committee and the Senate Finance Committee who contended for an increase in the duty on decolorizing and deodorizing carbons was a representative of Darco Corp. of Wilmington, Delaware, one of the two U. S. manufacturers of activated decolorizing and deodorizing carbons. Hearings on Tariff Readjustment—1929 Before the Committee on Ways and Means, House of Representatives, *supra*, Vol. I, pp. 803–808; Hearings on H.R. 2667 Before A Subcommittee of the Senate Committee On Finance, 71st Cong., 1st Sess., Vol. I, pp. 298–301 (1929). He complained of greatly expanded imports of activated carbons—a 300 percent increase in four years, and estimated to equal 30 to 50 percent of domestic production; said that in the last seven years the number of U. S. producers of decolorizing carbons had been reduced from four to two, and that the present rate of duty was not sufficient to enable his company to operate at a profit. He submitted a brief before the Ways and Means Committee warning of higher prices to consumers should domestic industry be destroyed and pointing out that factories capable of producing activated carbon for gas masks should be available in case of emergency.

The brief described decolorizing carbons as follows:

Decolorizing carbons are made by chemically treating raw materials such as wood, peat, lignite, black ash from paper mills, rice hulls, kelp, etc., and heating in nickel alloy retorts to temperatures of approximately 2,000°F. (1,100°C.). After cooling

the charred material, it is ground and then given a further chemical treatment. . . . The process employed in making decolorizing carbon is called activation, and the carbons so produced are referred to as activated carbons.

■■ Nowhere in the legislative history of paragraph 69 is there to be found any concern over importation of *spent* activated carbons or raw materials used in making activated carbons, although a passing reference to revivifying a "spent Norit carbon" was made in a statement from the Dutch General Norit Co. *in opposition* to the proposed increase in duty. Hearings Before Subcommittee of Senate Comm. on Finance, *supra*, Vol. XVIII, p. 158. From a scientific point of view, it could be said that *spent* activated carbons are "activated carbons." However, it is a familiar rule that a thing may be within the letter of the statute and yet not within its spirit, nor within the intention of its makers. Church of the Holy Trinity v. United States, 143 U.S. 457, 459, 12 S. Ct. 511, 36 L.Ed. 226 (1892). Moreover, tariff acts are not usually drafted in the terms of science but according to the meaning given by trade and commerce. Meyer & Lange v. United States, 6 Ct. Cust.App. 181, T.D. 35436 (1915).

■ Accordingly, we hold that Congress did not intend to reach merchandise such as that here in question by paragraph 69 and that the government's classification under said paragraph was erroneous.

Turning now to appellant's contention that the merchandise should be classified under paragraph 1555 as "Waste, not specially provided for," appellant argues that the original purpose of the merchandise in question was that of a gas adsorbing char or carbon for gas masks and that it is no longer usable (either in its present state or after reactivation) for such purpose. The government, on the other hand, states the original purpose more broadly as "a gas-adsorbent activated charcoal" and points

out that, after regeneration, rejuvenation, or revivification, "a good deal of it" was sold by appellant as a gas-adsorbent activated charcoal.

"Original purpose" is a critical issue in light of what the U.S. Customs Court refers to as the "classic" definition of waste in Harley Co. v. United States, 14 Ct.Cust.App. 112, T.D. 41644 (1926), namely:

In the tariff sense, waste is a term which includes manufactured articles which have become useless for the original purpose for which they were made and fit only for remanufacture into something else.

The government relies, as did the U.S. Customs Court, on Supreme Tire & Rubber Co. v. United States, 7 Cust.Ct. 193, C.D. 566 (1941), wherein old rubber automobile tires fit not only for remanufacture for their rubber material but also for repair by vulcanizing or retreading were held dutiable as automobile tires and not as scrap or refuse india rubber fit only for remanufacture. Apparently, it would equate the "repair" of automobile tires with "regeneration" of the spent activated carbon here involved. If the broad sense of "original purpose" contended for by the government is followed, the point might be well taken. Otherwise, it would not be, for no one is contending that the spent activated carbon here was regenerated to become a gas adsorbing carbon for gas masks. *See also* Selective Salvage Co., Inc. v. United States, 181 Ct.Cl. 695, 386 F.2d 1008 (1967) (holding imported tire carcasses not "tires" for purposes of federal excise tax).

■ We agree with appellant's interpretation of "original purpose," because it accords with practice in the commercial world. Meyer & Lange v. United States, *supra*. The legislative history to which we have already referred in our interpretation of paragraph 69 is highly pertinent. The Summary of Tariff Information, 1929, *supra*, stated (p. 334):

The industrial application of these carbons, also known as activated car-

bons, is largely a result of the wartime development of carbons for gasmask cannisters [sic] to absorb chemically inert lethal gases.

\* \* \* \* \* \*

There are different grades of domestic and foreign carbons, *for different purposes.* (Emphasis supplied.)

The brief of the witness before the House Ways and Means Committee, referred to above, stated:

Activated decolorizing carbon is one of the products resulting from extensive research work done during the World War to develop an active carbon suitable for use in gas masks as an adsorbent for poisonous gases. Activated carbons for gas masks are made by a process and from a raw material designed to increase the gas adsorption property of the carbon, while activated carbons for decolorizing and deodorizing liquids are made by a process and from a raw material designed to increase to the utmost, the property of removing color bodies from liquids. *The carbons cannot be used interchangeably.* (Emphasis supplied.)

On the meaning of "remanufacture," as distinguished from "repair" in the *Supreme Tire & Rubber Co.* case and regeneration of spent activated carbon in this case, we note particularly Cheltenham Supply Corp. v. United States, 306 F.Supp. 472, 63 Cust.Ct. 271, C.D. 3908 (1969), cited by the U.S. Customs Court in its opinion. There the court used the words "regenerated," "reprocessed" and "remanufactured" to describe the same activity. Moreover, it had no difficulty in following commercial practice by distinguishing the original purpose of the merchandise (cellophane), which was packaging of foods to be frozen, from wrapping of wall plates and metal products following "regeneration." The court specifically rejected the government's broad approach to "original purpose," namely: use in the packaging

trade. It should also be noted that, semantics aside, remanufacture is not an absolute requirement for classification as "waste" in any and all cases. United States v. Studner, 427 F.2d 819, 57 CCPA 122, C.A.D. 990 (1970).

 Accordingly, we hold that appellant has sustained its burden of proof that the merchandise in question is classifiable under paragraph 1555, Tariff Act of 1930, as modified by T.D. 22739.

The judgment of the U.S. Customs Court is, therefore, reversed.

Reversed.

MARKEY, Chief Judge, dissenting, with whom RICH, Judge, joins:

With due respect, I think the decision below is free of error.

I agree with the majority that the "classification" and "absorbent" issues should be disregarded. The first is based on a Customs "report" not of record and not argued below. The second has no relevance to "and all activated chars and carbons" in paragraph 69.

The majority opinion, turning as it does on legislative history, recognizes that *nothing* in that history reflects Congressional concern over importation of "spent" activated carbon. For all that can now be known, the employment of "and *all* activated chars and carbons" [emphasis mine] in paragraph 69 is equally interpretable as intended to cover activated carbon in any form, "spent" or not.

Whether considered from a scientific or commercial point of view, the imported merchandise *was* activated carbon. Once activated it remained so. "Activated" simply described its physical structure. It means that the cellular structure is such as to provide an abundance of entrapment areas. The merchandise may have been *wet* activated carbon and *dirty* activated carbon, but activated carbon it was.

"Spent" is not the same as "used up" when applied to activated carbon, which

is no more "spent" when its interstices are full and dirty than a sponge is "spent" when it is filled with water and deleterious particles, regardless of the specific physical phenomenon involved in the entrapment process. The mere application of heat and cleaning, like the emptying and cleaning of a sponge, is sufficient to "unspend" or regenerate the activated carbon for its intended purpose, i. e., entrapment. To me, the imported goods were not "raw material" used in making activated carbon but the thing itself, albeit wet and dirty.

Appellant sold the imported goods, after regeneration, as activated carbon, to be used for a number of the well-known purposes to which activated carbon has normally, commercially been put over many years. Adhering to the analogy, a sponge originally employed to hold water becomes no less a sponge when squeezed and then employed to hold orange juice. Hence the prior use in gas masks and the acquisition of moisture would not, in my view, convert the imported activated carbon into something "useless for the original purpose" and "fit only for remanufacture into something else." Harley Co. v. United States, 14 Ct.Cust.App. 112, T.D. 41644 (1926). There is nothing in paragraph 69 requiring restriction to any specific use of the activated carbon classified thereunder.

The government classified the imported merchandise, under paragraph 69, exactly as what it is, namely an activated carbon. That ends the matter and I would stop there.

Moreover, much of the decision below turns, in my view, on the testimony of witnesses, whose demeanor and forthrightness were observed by the trial judge and are denied to us. The facts of the present case, as I read them, parallel those in the *Supreme Tire* case. I find therefore, no reversible error in the decision below and would, accordingly, affirm it.