**IRVING BERLIN MUSIC COR-PORATION**

v.

**The UNITED STATES.**

**No. 508–69.**

United States Court of Claims.

Nov. 14, 1973.

William F. Sondericker, New York City, attorney of record, for plaintiff. Richard B. Rodman, New York City, and Richard D. Belford, Tarrytown, N. Y., of counsel.

Richard B. Stone, Washington, D. C., with whom was Asst. Atty. Gen., Scott P. Crampton, for defendant. Gilbert E. Andrews, Jr., and Theodore D. Peyser, Jr., Washington, D. C., of counsel.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG and BENNETT, Judges.

## ON DEFENDANT'S MOTION AND PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

KASHIWA, Judge.

Plaintiff filed this suit for the refund of federal personal holding company income taxes and assessed interest for the fiscal years ended January 31, 1965, and January 31, 1966, in the respective amounts of $137,524 and $160,851, plus interest.

The case comes before us on defendant's motion for summary judgment and plaintiff's cross-motion for summary judgment. The facts are stipulated and there are no material issues of fact. We hold for the defendant for the reasons hereinafter stated.

The essential facts are as follows. Irving Berlin has composed about 1,000 musical compositions, of which about 650 continued to be published and offered for sale to the general public and to professional users of music during the tax years in question. In 1946 he incorporated Irving Berlin Music Corporation (hereinafter Berlin Music), a New York corporation. Irving Berlin has been the sole owner of all of the authorized and issued capital stock of Berlin Music since its formation. In 1946 Irving Berlin entered into an agreement with Berlin Music establishing their working relationship much along the lines prescribed by the Songwriters Protective Association standard form contract used by most music publishers in the industry.[1]

On January 31, 1960, Irving Berlin and Berlin Music entered into a new agreement superseding the earlier 1946 agreement. Under the 1960 agreement, Berlin Music continued as exclusive licensee to publish or issue licenses to publish the music compositions of Irving Berlin; however, Irving Berlin engaged Berlin Music to act as his "exclusive agent"[2] to: (1) issue licenses to manu-

---

1. By this agreement, Irving Berlin granted to his corporation, which he designated as "Publisher," among other things, the exclusive license to: (1) publish and issue licenses to publish his musical compositions worldwide; (2) issue licenses authorizing the manufacture of parts of instruments serving to mechanically reproduce his compositions worldwide; (3) issue licenses to reproduce his compositions worldwide for broadcasting purposes; (4) issue licenses with regard to all performing rights protected by all domestic and foreign copyrights to his musical compositions; and (5) generally to exploit and market such musical compositions and rights therein. The corporation was entitled to retain the proceeds from the sale of sheet music less a set royalty on each sale. As additional compensation for its services, the corporation was entitled to deduct and retain 50 per cent of the gross fees it derived from licenses and to retain fully the publisher's share of the distribution from the American Society of Composers, Authors and Publishers (ASCAP), or other performing rights societies.

2. Originally, it appeared that the change from the 1946 "license agreement" to the 1960 "agency agreement" was the basis upon which the taxpayer was building his argument. However, the taxpayer argued the case on the theory that, even under the 1946 contract, an agency was intended; and the word "license" was used but did not accurately describe the

facture parts of instruments serving to mechanically reproduce his compositions; (2) issue licenses to reproduce his compositions for broadcasting purposes; and (3) issue licenses with regard to all performing rights to his music. The publisher's share of the compensation remained substantially the same as under the 1946 agreement.

Ever since its establishment, Berlin Music has been actively engaged in the music-publishing business. During the tax years in question, the company's activities [3] were performed solely with respect to compositions created in whole or in part by Irving Berlin, its sole shareholder. The Government does not make the claim that Berlin Music was a mere sham corporation. Indeed, in light of the substantial business activity of the plaintiff, as well as the admitted bona fide business purpose in creating the company, no such claim is feasible.

In today's music industry, the composition of a song is only the first step in a highly sophisticated system of song creation, promotion, and distribution. By way of illustration, one powerful force

---

arrangement. In any event, the taxpayer does not allege that the change significantly altered the nature of the music-publisher services it performed on behalf of Irving Berlin, including licensing, as well as the method by which all of such services were performed. Like other established music publishers, taxpayer continued under the 1960 agreement, as under the earlier 1946 agreement, to receive 50 per cent of the gross royalties derived from performing rights licenses it issued to music users for the use of Irving Berlin's songs.

3. These activities can be categorized and described as follows:

(a) *Development of Songs.* Plaintiff assisted Irving Berlin in preparing musical compositions for initial commercial and professional use. Plaintiff's activities in this regard involved such technical aspects as the transcription of compositions in musical form.

(b) *Preparation of Musical Arrangements.* Plaintiff's employees prepared piano forte arrangements of each of Irving Berlin's compositions for sale to the general public in sheet music form. In addition, plaintiff caused to be prepared arrangement for every conceivable user or purchaser of popular music. Plaintiff also prepared or caused to be prepared professional arrangements to be used by particular orchestras in connection with the promotion and exploitation of a particular musical composition.

(c) *Exploitation and Sales Promotion Services.* Plaintiff supervised and conducted the sales of sheet music and the distribution of professional arrangements of Irving Berlin's compositions. Sales of sheet music and arrangements were handled by plaintiff's sales staff which called upon all major music stores and music jobbers throughout the United States.

In some instances, as part of the promotion and exploitation of Irving Berlin's songs, plaintiff also prepared special arrangements of songs to suit the particular style of many well-known singing personalities. This was done either by arrangers employed by the plaintiff or done by outside independent arrangers hired and paid for by the plaintiff for each particular transaction.

To exploit and promote Irving Berlin's compositions, the plaintiff employed "professional men" known to the public as "song pluggers," whose responsibility was to make the rounds of orchestra leaders, band leaders, singers, instrumentalists, recording companies and producers of radio and television shows in order to insure frequent performances of the compositions. These men kept a constant watch on all users of songs whose public performance of a song would bring it to the public attention and create a demand for sheet music or records. In addition, demonstration records were made at plaintiff's expense of any song deemed promising which was then given to recording companies, disc jockeys, and the like.

(d) *Licensing.* The major revenues obtained from the exploitation of musical compositions were, during the taxable years in question, derived from the "grand performing rights" which included legitimate stage productions, electrical transcriptions, phonograph records, motion picture synchronization, stock and amateur rights, and dramatic uses on radio and television. Each grant or license of a grand performing right had to be separately negotiated and issued. During the life span of a particular song, such licenses number many hundreds requiring specialized business expertise to achieve the highest possible royalties to the author/composer without pricing the musical composition out of the market. Plaintiff, as "agent" and/or its subagents negotiated, prepared, and granted such licenses. Any unusual or significant request required the personal approval and consent of Irving Berlin before a license would be issued. No performing rights licenses were ever issued over Irving Berlin's objection.

(e) *Bookkeeping and Accounting.*

(f) *Stock Room and Shipping.*

in the music industry is the American Society of Composers, Authors and Publishers (hereinafter ASCAP). ASCAP's constitution provides for two classes of participating membership: first, author and composer (or writer) membership, and, second, publisher membership. Irving Berlin was an original founder-member of ASCAP and remains a writer member to date. As a condition to writer membership, each writer member agrees that during the term of his written agreement with ASCAP, the nonexclusive, nondramatic rights of public performance of the writer's musical compositions then existing or created during the term of his agreement are immediately vested in ASCAP.

Berlin Music has been a publisher member of ASCAP from its inception and continues so to be. Each publisher member, as a condition to membership, agrees that during the term of its written agreement, the nonexclusive, nondramatic rights of public performance of compositions published by it during the term of its agreement are vested in ASCAP.

ASCAP is a performing rights society. It has nothing to sell—no sheet music, no phonograph records, no "Broadway musicals," no musicians or vocalists. ASCAP simply licenses radio stations and networks, television stations and networks, wired music services, orchestras, electrical transcribers, and others who perform musical compositions for profit, to perform nondramatic performances of all compositions in its catalogues in return for payment of royalties by such music users. Nondramatic performing rights are commonly referred to in the music industry as "small performing rights." After payment of operating expenses and such reserves as are established by the ASCAP board of directors, the remaining royalties are divided into two pools, a writers' pool and a publishers' pool, each pool receiving 50 percent of the royalties which are thereafter distributed to the writer members and the publisher members.

In discussions with ASCAP as to its requirements for recognition of Berlin Music as a publisher member, ASCAP insisted that Berlin Music obtain from Irving Berlin, the copyright owner, an exclusive printing and publishing license, but it did not object to Irving Berlin's desire personally to retain title to his song copyrights and engage his corporation as exclusive agent therefor. Accordingly, the publishers' share of the ASCAP royalties from small performing rights licenses issued for the use of Irving Berlin's musical compositions were distributed quarterly by ASCAP to Berlin Music as a publisher member.

The major revenues obtained from the exploitation and promotion of musical compositions by music publishers are derived from royalties paid by music users for grand performing rights licenses. It is with respect to grand performing rights that the controversy in this case arises. Unlike the situation with respect to ASCAP, no actual license was granted to Berlin Music. Unlike the small performing rights licenses handled by ASCAP, grand performing rights encompass dramatic performances of music, including legitimate stage productions, electrical transcriptions, phonograph records, motion picture sound synchronization, stock and amateur theater rights, and dramatic uses on radio and television. Finally, unlike small performing rights to Irving Berlin's music, grand performing rights licenses are not within the purview of ASCAP's authority but are separately negotiated and issued by Berlin Music to music users. Berlin Music collects royalties from music users under licenses issued solely for the use of or the right to use Irving Berlin's musical compositions. In the case of recording companies, Berlin Music typically employs the Harry Fox Agency, whose responsibility it is, as agent and trustee, to execute such licenses and collect and remit the royalties therefrom to Berlin Music. During the life span of a particular song, these licenses number many hundreds, requiring specialized business expertise to achieve the highest possible

royalties without pricing the musical composition out of the market.

It has been stipulated that all of the services performed by Berlin Music were performed in a manner similar to other established music publishers typical of the music industry. Under *both* the 1946 and 1960 agreements between Irving ·Berlin and his corporation, Berlin Music was empowered to deduct and retain as compensation for its music publisher services 50 per cent of the gross royalties paid by music users to Berlin Music under the performing rights licenses it issued. This arrangement represented the normal and customary percentage in the music industry as evidenced by the Songwriters Protective Association standard form contract. In addition, as with the standard form contract, *supra,* Berlin Music was also entitled to the royalties distributed to it by ASCAP as the result of its publisher membership and, as concerns the sale of printed sheet music, Berlin Music typically agreed to pay to Irving Berlin a fixed royalty as to each type of sheet music arrangement sold.

During the fiscal years ended January 31, 1965, and January 31, 1966, Berlin Music deducted and retained $233,877 and $230,565, respectively, as the 50 per cent portions of the gross royalties paid by music users under the performing rights licenses it issued for the use of or the right to use Irving Berlin's songs. In a statutory notice of deficiency dated June 9, 1967, the Government determined that these amounts constituted copyright royalties under section 543(a)(4) of the Internal Revenue Code of 1954,[4] and, therefore, that Berlin Music was a personal holding company under section 542 (a) of the Code.

The case was ably briefed and argued by the respective counsel for plaintiff and defendant, and the parties have succeeded in narrowing the issue before us to one of statutory construction. We are called upon to determine whether the shares of copyright royalties received and retained by taxpayer Berlin Music under performing rights licenses issued to music users for the right to use the musical compositions of taxpayer's sole stockholder, Irving Berlin, constitute copyright royalties to it within the meaning of section 543(a)(4) and hence are subject to the tax on personal holding company income; or whether such amounts are merely compensation for services rendered.

The provisions dealing with personal holding companies (sections 541–547) have been a part of the federal tax law since 1937. Basically, the tax, now at a 70 per cent level, is imposed upon the undistributed income of those companies classified as personal holding companies. The basic factors which enter into this classification have been summarized as follows :.

> * * * To constitute a personal holding company, a corporation must meet both an income test and a stock ownership test, viz., at least 60 percent of its "adjusted ordinary gross income" must be "personal holding company income" (primarily passive investment income, plus personal service income in the case of "incorporated talents," * * *); and more than 50 percent of its stock (by value) must be owned—directly or indirectly, actually or constructively—by five or fewer individuals * * *. [Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders 8–34, 8–35 (3d ed. 1971).]

Section 543, the relevant portions of which are set forth in the margin,[5] de-

---

4. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated.

5. SEC. 543. Personal Holding Company Income.

   (a) *General rule.*—For purposes of this subtitle, the term "personal holding company income" means the portion of the adjusted ordinary gross income which consists of:

   (1) *Dividends, etc.*—Dividends, interest, royalties (other than mineral, oil, or gas royalties or copyright royalties), and annuities. * * *

    *     *     *     *     *

fines exactly what income is to be classified as "personal holding company income." Section 543(a)(4) is a long, intricate, but not altogether lucid paragraph which includes copyright royalties within the definition of personal holding company income; excepts from this broad inclusion certain types of copyright royalties; and seeks to define exactly what is meant by the term "copyright royalties." This definition is at the core of our inquiry:

> *For purposes of this subsection*, the term "copyright royalties" means *compensation, however designated*, for the use of, or the right to use, copyrights in works protected by copyright issued under title 17 of the United States Code (other than by reason of section 2 or 6 thereof) and to which copyright protection is also extended by the laws of any country other than the United States of America by virtue of any international treaty, convention, or agreement, *or interests in any such copyrighted works, and includes payments from any person for performing rights in any such copyrighted work* \* \* \*. [Emphasis supplied.]

Essentially, the taxpayer argues that for the definition of copyright royalties, included as one form of personal holding company income, we need look no further than the law of copyrights. It is asserted that section 543(a)(4) effectively adopts the copyright law definition, the latter of which requires that the party receiving "royalties" must hold a proprietary interest in the copyright. Since Berlin Music never had a proprietary interest in Irving Berlin's copyrights, plaintiff would halt our inquiry at the definitional level. Thus, according to plaintiff, Berlin Music never received "copyright royalties" but only mere compensation for services rendered. We cannot agree.

It is our view that the drafters of the personal holding company legislation purposefully drew the definition of copy-

---

(4) *Copyright royalties*—Copyright royalties; except that copyright royalties shall not be included if—

(A) such royalties (exclusive of royalties received for the use of, or right to use, copyrights or interests in copyrights on works created in whole or in part, by any shareholder) constitute 50 percent or more of the ordinary gross income,

(B) the personal holding company income for the taxable year computed—

(i) without regard to copyright royalties, other than royalties received for the use of, or right to use, copyrights or interests in copyrights in works created in whole, or in part, by any shareholder owning more than 10 percent of the total outstanding capital stock of the corporation,

(ii) without regard to dividends from any corporation in which the taxpayer owns at least 50 percent of all classes of stock entitled to vote and at least 50 percent of the total value of all classs of stock and which corporation meets the requirements of this subparagraph and subparagraphs (A) and (C), and,

(iii) by including as personal holding company income the adjusted income from rents and the adjusted income from mineral, oil, and gas royalties, is not more than 10 percent of the ordinary gross income, and

(C) the sum of the deductions which are properly allocable to such royalties and which are allowable under section 162, other than—

(i) deductions for compensation for personal services rendered by the shareholders.

(ii) deductions for royalties paid or accrued, and

(iii) deductions which are specifically allowable under sections other than section 162, equals or exceeds 25 percent of the amount by which the ordinary gross income exceeds the sum of the royalties paid or accrued and the amounts allowable as deductions under section 167 (relating to depreciation) with respect to copyright royalties.

For purposes of this subsection, the term "copyright royalties" means compensation, however designated, for the use of, or the right to use, copyrights in works protected by copyright issued under title 17 of the United States Code (other than by reason of section 2 or 6 thereof) and to which copyright protection is also extended by the laws of any country other than the United States of America by virtue of any international treaty, convention, or agreement, or interests in any such copyrighted works, and includes payments from any person for performing rights in any such copyrighted work and payments (other than produced film rents as defined in paragraph (5)(B) received for the use of, or right to use, films. For purposes of this paragraph, the term "shareholder" shall include any person who owns stock within the meaning of section 544.

\*     \*     \*     \*     \*

right royalties to encompass precisely the case presently before us. The definition begins with words of limitation: "For purposes of this subsection, * * *." Thus, the definition is not to have application for every section of the Code but is to be limited to subsection (a) of section 543. We have noted in previous opinions that drafters of tax legislation have demonstrated keen awareness of the technique of identifying the scope of definitions. For example, the definition of a life insurance company in section 801(a) is to apply "[f]or purposes of this subtitle," i. e., Code sections 1 through 1564. On the other hand, section 804(a)(1) refers to a rule solely "[f]or purposes of the preceding sentence * * *." See United American Ins. Co. v. United States, 475 F.2d 612, 619–620, 201 Ct.Cl. 32, 44–46, (1973). Thus we begin our inquiry into the definition of the term "copyright royalties" with the knowledge that the definition is to apply for purposes of identifying personal holding company income; i. e., "[f]or purposes of * * * subsection [(a) of section 543.]"

While Congress could have merely adopted the definition of royalties contained in the copyright laws, this procedure was not followed. Rather, copyright royalties, for personal holding company income purposes, was broadly and specially defined as

> * * * *compensation, however designated,* for the use of, or the right to use, copyrights in works protected by copyright issued under title 17 of the United States Code * * *, or interests in any such copyrighted works, and includes payments from any person for performing rights in any such

copyrighted work * * *. [Emphasis supplied.]

The focus is thus not upon any proprietary interest in the copyright but rather that "compensation, however designated" be classified as copyright royalties (and, ultimately, as personal holding company income) when it is paid "for use of, or the right to use, copyrights." [6] We find that paragraph 10 of the 1960 agreement brings the income within the statutory definition when it was provided that

> 10. As full compensation for Publisher's services, Writer agrees that Publisher may deduct and retain 50% of the gross license fees received by Publisher as Writer's agent from licenses granted by Publisher on Writer's behalf, pursuant to the terms and provisions of Paragraph 3 hereof.

The crucial point is that, although designated as compensation for "services," the payment is solely a function, a percentage of the royalties received. Berlin Music was far more than a mere collection agent. It had the exclusive right throughout the term of the copyrights to issue licenses (subject to Irving Berlin's personal approval in the case of an unusual or significant arrangement; see Footnote 3(d), *supra*) and, in general, to exploit those copyrights in return for which it received 50 per cent of the royalties derived from the copyrights. It is precisely the same arrangement, in fact if not in words, which would have existed had a standard publishing agreement to an outside firm been negotiated.

Irving Berlin was the sole shareholder of Berlin Music and could, in his unfettered discretion, choose to call the amounts retained by Berlin Music agen-

6. It is also significant, although not directly applicable to the problem of grand performing rights, that the definition of copyright royalties also "includes payments from any person for performing rights in any such copyrighted work." Thus, the royalty payments from ASCAP, half of which, after adjustments, were paid to Berlin Music, are clearly copyright royalties. It is noteworthy that, if anything, this language is an even clearer indication that the traditional notions (i. e., the proprietary interest requirement) as to what the status of a royalty recipient must be were being abandoned. Rather than concentrating on what proprietary relationships, if any, were required by the nature of the business, the choice of the word "payments" is suggestive that the compensation to be divided equally between writer and publisher was to be tainted as copyright royalties irrespective of technical arrangements.

cy fees. However, whatever the consequences of this decision are in other tax and non-tax areas, with respect to personal holding companies, such a unilateral classification cannot alter what are, otherwise, copyright royalties in the hands of Berlin Music. The detailed and specific definition of copyright royalties for purposes of personal holding company income leaves no room for plaintiff's argument that royalties cannot exist in the hands of a taxpayer not having a proprietary interest in the copyright.

Perhaps the best proof of what Congress meant by "copyright royalties" is the recent (1960) legislation on the subject. Prior to 1960, section 543(a)(1), as then in effect, merely defined personal holding company income to include royalties:

> SEC. 543. Personal Holding Company Income.
>
> (a) *General Rule.*—For purposes of this subtitle, the term "personal holding company income" means the portion of the gross income which consists of:
>
>> (1) *Dividends, etc.*—Dividends, interest, royalties (other than mineral, oil, or gas royalties), and annuities. * * *
>>
>> * * * * * *

Section 543 was amended in 1960 to deal more specifically with copyright royalties by P.L. 86-435, 74 Stat. 77. The reasons prompting this legislation are well stated in a Treasury Department Memorandum made a part of the Senate Committee on Finance Report pertaining to the bill ultimately enacted, H.R. 7588. The following excerpts from the Treasury memorandum bear crucially upon our inquiry:

### 3. *Legislative history*

The personal holding company provisions, first enacted in 1934, were developed to prevent the avoidance of income tax on individuals by means of the formation of closely held corporations to which were transferred the individuals' investments and services or talents. In addition to the regular corporation income tax, personal holding companies are subject to a special tax of 75 percent of the first $2,000 of undistributed personal holding company income plus 85 percent of such income in excess of $2,-000. A corporation may, however, avoid the imposition of the personal holding company tax by actual or consent distributions of its personal holding company income. The personal holding company provisions have been modified over the years since 1934, but the fundamental purpose has not been altered by succeeding Congresses.

Personal holding company income is, in general, that income which is received from certain types of investment and personal service sources as specified in the code. Although the legislative history of the personal holding company provisions indicates, as a general rule, an intent not to apply such penalty tax to a true operating company, an operating company is not ipso facto excluded from the classification as a personal holding company and there is no indication that a true operating company could, or should, never be classified as a personal holding company.

The Treasury Department opposed an earlier version of the bill (H.R. 5478, introduced in the 1st sess. of the 85th Cong.) in a report to the House Ways and Means Committee, dated July 18, 1957, on the grounds that the terms used in the bill were too general and might permit avoidance of the personal holding company tax by many corporations to which the tax should appropriately apply. A revised bill (H.R. 8960, introduced in the same session) met some of our earlier objections, and was passed by the House of Representatives on August 16, 1957. However, the Department continued to study this matter and became concerned that the bill might still permit certain tax benefits which do not seem desirable. Therefore, we report-

ed to your committee on January 28, 1958, that we were opposed to the enactment of H.R. 8960. H.R. 7588 appears to have met all of our objections to H.R. 8960.

### 4. Comments on the bill

(a) *Policy.*—Prior studies have been made regarding the amendment of the personal holding company provisions to provide relief from the personal holding company tax for corporations engaged in the music publishing business. It appears that a reasonably favorable showing has been made that some music publishers are operating companies and should not be subjected to the personal holding company tax merely by reason of the fact that their chief source of income consists of "copyright royalties." (See H.Rept.No.1047, 85th Cong., 1st sess., on H.R. 8960.) It was pointed out that recent developments have tended to shift the source of income of music publishers from the sale of sheet music (which is not personal holding company income) to royalty income (which is personal holding company income), a shift that is due in part to the fact that radio, motion pictures, and television, and the expansion in the use of phonograph records have increased the royalty income derived from song copyrights, and in part to the fact that the more extensive use of the services provided by performing rights societies has increased the royalty income from live performances of songs by orchestras and others in hotels, night clubs, theaters, and in television. As a result of technological and other changes in the music-publishing industry, publishers today receive much of their income from royalties but, despite that fact, it is contended that most music publishers are not passive investment-type organizations.

*Our principal objection to H.R. 8960 was that it would apparently have been possible for a composer of a song to incorporate and, by incurring costs in promoting the song equal to more than 50 percent of his gross income from the song, avoid both the personal holding company tax and the higher personal income tax rates that might be applicable if he did not incorporate. H.R. 7588 meets this objection by excluding royalties received from copyrights or works created by any shareholder from the 50 percent or more of gross income test.* [Emphasis supplied.] [S.Rep.No.1041, 86th Cong., 2d Sess., pp. 5–6 (1960), U.S.Code Cong. & Admin.News, p. 1901 (1960–1 Cum.Bull. 817, 820–821).]

Further, the Committee's own summary of the bill gives every indication that the amendment with respect to publishing firms was being applied to a broad definition of copyright royalties:

\* \* \* Copyright royalties are defined as compensation with respect to copyrights protected by the U.S. Government, or protected by the laws of other countries as a result of international treaties, etc., or interests in these copyrights. They are also to include payments with respect to those copyrights received from performing rights societies or organizations. \* \* [S.Rep.No.1041, 86th Cong., 2d Sess., p. 2 (1960) U.S.Code Cong. & Admin. News, p. 1898 (1960–1 Cum.Bull. 817, 818).]

Section 543(a)(4)(A) translates this Congressional purpose into law. Although the general rule is to be that copyright royalties are classified as one variety of personal holding company income, copyright royalties will not be so included if

(A) such royalties (exclusive of royalties received for the use of, or right to use, copyrights or interests in copyrights on works created in whole, or in part, by any shareholder) constitute 50 percent or more of the ordinary gross income,

Subparagraphs (B) and (C) further carry out the Congressional purpose of insuring that in order to qualify for the exemption, the company is actively en-

gaged in the publishing business. What is significant about subparagraph (A) for our purposes is that for companies exploiting shareholder-created works, no amount of business activity on the part of the company will entitle that company to have its income exempted from the taint of copyright royalty personal holding company income. In the case of companies exploiting shareholder-created works and receiving copyright royalties, the intensity of business activity is totally irrelevant. Thus, plaintiff's discussion of the bona fides of Irving Berlin's need for a company to exploit his works and of the scope of the business activity of the company is really beside the point. Congress chose not to confer the benefit when shareholder-created works were being exploited. We have before us the ultimate example of Congressional concern, as Berlin Music publishes nothing but the songs of its 100 per cent shareholder.

Plaintiff's position in this case is that it could not, in any event, take advantage of the active publishing business exception contained in section 543(a)(4)(A), (B), and (C) because Irving Berlin, whose songs were being exploited and serviced by Berlin Music, owned 100 per cent of the stock of the plaintiff. However, plaintiff urges that the problems addressed by this aspect of the statute are beyond the facts of a case in which no "copyright royalties" are received. It is our view that the plaintiff's definition of copyright royalties is so narrowly and technically circumscribed as to lead inexorably to a strained reading of the statute as a whole and to an ef-

fective undercutting of the intent displayed by Congress in enacting the 1960 limited amendments.

In enacting section 543(a)(4)(A), (B), and (C), Congress undoubtedly intended to exclude certain qualifying music publishers from the burden of the personal holding company tax. Berlin Music, however, simply does not fall within this exceptional class. Congress evidently determined that the relationship between an author and his own publishing company, regardless of the formal arrangements (dictated by the shareholder) governing that relationship and regardless of the similarities the company might bear to any other active publishing company, gave rise to the potential for use of that company as an "incorporated pocketbook" against which the personal holding company tax is aimed. Plaintiff's interpretation of the statute would eat into the very fiber of this Congressional purpose.

Having withheld the benefits of the active publisher exception from taxpayers in plaintiff's position, we cannot ascribe to Congress an intent to open a loophole to a taxpayer when its sole shareholder simply relabels the amounts received as compensation for the work of an agent. In the context of a broad definition of copyright royalties together with a definite line being drawn between outside versus related companies, we cannot accept an argument that Congress intended to attach any significance to an arrangement, operationally [7] identical to the classic royalty system, relabeled as an agency. It is for this very reason that Congress chose to give its broad def-

---

7. The taxpayer admitted, during oral argument, that the arrangement, in the instant case was "operationally" identical with a classic royalty arrangement. The taxpayer attempted to distinguish the two cases by arguing that different consequences, such as those occurring in bankruptcy, resulted from a choice of system. Plaintiff even conceded that had a nonexclusive license been granted to Berlin Music, this would have been a sufficient interest to require a holding that copyright royalties had been received. While it is true that different consequences, such as

on bankruptcy, may result (and while we admit that in different context we might be persuaded that these differences could command different tax treatment), Congress' concern, at least with respect to personal holding company income, was specific: not to allow a benefit to companies deriving as income, however, this compensation is designated, a percentage of the copyright royalties collected. Simply stated, Congress provided that shareholder-created works could not be exploited without characterizing the royalties thereon as personal holding company income.

**550**

inition, for purposes of subsection 543 (a), to the term "copyright royalties."[8] Under the plaintiff's definition, on the other hand, any composer-shareholder of a closely held music publisher, engaged in issuing performing rights licenses in his behalf, would be permitted totally to frustrate the statute by merely relabeling the 50 per cent share of copyright royalties otherwise charged by unrelated music publishers as "compensation for agent's services." Congress could never have intended such an anomalous result; and, therefore, it cannot be reasonably imputed to the very broadly framed statute defining copyright royalties. See Select Tire Salvage Co. v. United States, 181 Ct.Cl. 695, 703, 386 F.2d 1008, 1012 (1967). We need not comment on what result would be reached had plaintiff been compensated under a different formula. It is enough to say that when compensation is "operationally" identical to that of the classic royalty scheme, such payments cannot be converted to something other than copyright royalties for the purpose of that definition.

We hold that section 543(a)(4) simply does not define copyright royalties in a manner which requires a finding of a "proprietary interest" in the underlying copyright. The definition does not spring from a finding of proprietary interest but rather from the situation in which compensation is to be measured in terms of a percentage of the royalties paid for the use or right to use copyrights.[9]

For the foregoing reasons, we hold for the defendant and allow its motion for summary judgment. Plaintiff's cross-motion for summary judgment is denied and the petition is hereby dismissed.

---

8. It has long been a basic principal of statutory interpretation that

"* * * the court will not look merely to a particular clause in which general words may be used, but will take in connection with it the whole statute (or statutes on the same subject) and the objects and policy of the law, as indicated by its various provisions, and give to it such a construction as will carry into execution the will of the legislature, as thus ascertained, according to its true intent and meaning." [Brown v. Duchesne, 60 U.S. (19 How.) 183, 194, 15 L.Ed. 595 (1856).]

9. Cases cited, such as Kiesau Petroleum Corp., 42 BTA 69 (1940), Campbell v. Great Nat'l Life Ins. Co., 219 F.2d 693 (5th Cir. 1955), and Hopag, S. A., 14 T.C. 38 (1950), by plaintiff for the proposition that a proprietary interest in the copyright is a *sine qua non* to a finding of royalty income, predate the 1960 amendments to the personal holding company provisions and do not deal with the specific statutory definition of copyright royalties at issue here.