CLOWARD INSTRUMENT CORPORATION and KERRY BINGHAM CLOWARD, TRUSTEE IN DISSOLUTION OF CLOWARD INSTRUMENT CORPORATION, ET AL., [1] Petitioners, v. COMMISSIONER OF INTERNAL REVENUE, Respondent Cloward Instrument Corp. v. Commissioner
Docket Nos. 584-81, 585-81, 586-81.
United States Tax Court
T.C. Memo 1986-345; 1986 Tax Ct. Memo LEXIS 269; 52 T.C.M. (CCH) 34; T.C.M. (RIA) 86345; August 4, 1986. James M. Sattler and Robert J. Steinert, II, for the petitioners. Kenneth W. McWade, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: Docket No.
Year
Deficiency
584-81
1975
$13,112
1976
38,151
585-81
1975
13,112
1976
38,151
586-81
1976
23,388
The issues for decision are: (1) whether *271 petitioner Cloward Instrument Corporation must recognize accrued but unpaid interest income upon its liquidation in 1976; (2) whether petitioner Cloward Instrument Corporation is liable for personal holding company taxes for 1975 and 1976; (3) whether petitioner Kathleen C. Sattler received property with no ascertainable fair market value when she received certain contract rights from Cloward Instrument Corporation; and (4) whether petitioner Kathleen C. Sattler correctly determined the fair market value of a certain promissory note she received from Cloward Instrument Corporation. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are hereby incorporated by this reference. Cloward Instrument Corporation (CIC) is a dissolved Hawaiian corporation. Its petition was filed by Kerry Bingham Cloward as trustee in dissolution of CIC. When the petition was filed, CIC's mailing address was in Honolulu, Hawaii, and Kerry Bingham Cloward resided in Honolulu, Hawaii. CIC timely filed its Federal corporation income tax returns for the years in issue with the Fresno Service Center, Fresno, California. James M. Sattler *272 and Kathleen C. Sattler are husband and wife who resided in Honolulu, Hawaii, when they filed their petition in this case. They timely filed their joint Federal income tax return for 1976 with the Fresno Service Center, Fresno, California. Kathleen C. Sattler (Mrs. Sattler) received deficiency notices as both trustee and transferee of CIC's assets. The parties now agree that Mrs. Sattler is not a trustee, but is in fact a transferee of CIC's assets. The parties also agree that Mrs. Sattler's transferee liability should be limited to the value of the assets she received upon the dissolution of CIC. Ralph B. Cloward (Dr. Cloward) is a well-known neurosurgeon who originated and pioneered various surgical procedures and who also invented and designed certain surgical instruments with which to perform his surgical procedures. Dr. Cloward's procedure was used to provide relief for spinal disc injuries. In simple terms, the procedure, known as "fusion," involved removing a damaged spinal disc and replacing it with a bone fragment of similar size. The instruments Dr. Cloward designed for use in this procedure are generally known as "Cloward Instruments." Beginning sometime before *273 1951 and continuing the about 1968, Dr. Cloward requested a company known as Codman & Shurtleff, Inc. (Codman) to make for his personal use some of the surgical instruments he had invented and designed. Codman manufactured many of the instruments and sold them to Dr. Cloward. Dr. Cloward paid Codman for the cost of producing the first sample, or prototype, instruments, and also for the cost of the first "copy" which Dr. Cloward used to perform his surgical procedures. Prior to September 16, 1969, Dr. Cloward and Codman did not conduct business pursuant to any formal agreement. Codman sometimes sold Dr. Cloward's instruments to other physicians who placed orders for them. Sometime prior to 1951, Codman began to affix the label "Cloward" to the instruments Dr. Cloward designed. Prior to 1969, Codman never paid Dr. Cloward for the right to manufacture and sell instruments Dr. Cloward had designed, and never paid for the right to affix to the instruments the "Cloward" label. Dr. Cloward began to receive complaints from other surgeons regarding Codman's delay in filling their orders for Cloward Instruments. Some surgeons called Dr. Cloward with inquiries and complaints, requesting *274 that certain changes in design be made. Dr. Cloward accordingly asked Codman to make changes in some of the instruments. In 1967 and 1968, Dr. Cloward redesigned the instruments he had invented for use in the "Cloward Anterior Surgical Approach," a surgical procedure for removal of ruptured cervical disc lesions and osteophytes. Dr. Cloward became dissatisfied with Codman's progress at manufacturing the new instruments. Codman refused to retool its manufacturing equipment in order to make some of the new instruments. In early 1968, Dr. Cloward began a series of discussions and correspondence with Mr. Hal Markham, an employee of Codman who previously had worked on the development of Cloward Instruments with Dr. Cloward. The discussions involved plans for Mr. Markham independently to manufacture and market some of Dr. Cloward's instruments. Around May 1, 1968, Mr. Markham terminated his affiliation with Codman. Dr. Cloward and Mr. markham had as their objective to show samples of the newly-redesigned Cloward Instruments at a neurological meeting in Toronto in October 1968. At the Toronto meeting, representatives of Codman first learned of Dr. Cloward's and Mr. Markham's efforts *275 to develop, manufacture, and market the newly-redesigned Cloward Instruments. Dr. Cloward informed Codman's representative at the meeting that he no longer wished for Codman to use the Cloward name, that he had redesigned some of the Cloward Instruments, and that the new instruments were going to be manufactured by the Cloward Instrument Corporation (CIC), under the direction of Mr. Markham. CIC was incorporated in November 1968 by Dr. Cloward's three children, Kathleen C. Sattler, Karen C. McGregor, and Kerry Bingham Cloward.The three children were CIC's sole shareholders. Dr. Cloward was CIC's president throughout its corporate existence, yet he never received a salary or expense reimbursements, and he did not receive assets upon CIC's subsequent liquidation. CIC's articles of incorporation, dated November 29, 1968, named Mr. Markham as its vice-president. He subsequently declined to accept the position. When Codman's representative first learned of Dr. Cloward's plans to market new Cloward Instruments without Codman's participation, he quickly took active steps to persuade Dr. Cloward to return to a relationship with Codman. In January 1969, he wrote a letter to Dr. Cloward *276 in which he outlined the benefits of Dr. Cloward's relationship with Codman, and proposed that Codman continue marketing and manufacturing Cloward Instruments on an exclusive basis. In June 1969, CIC, Dr. Cloward, Mr. Markham, and Markham's corporation entered into an agreement in which Markham relinquished all of his rights and claims relating to Cloward Instruments "due to differences which have arisen in the course of said Project. * * *" On July 1, 1969, Dr. Cloward assigned to CIC certain rights relating to Cloward Instruments and the use of the name "Cloward." Under date of September 16, 1969, CIC, Dr. Cloward, and Codman entered into an agreement (hereinafter referred to as "the Agreement" or "the Codman agreement") which granted to Codman "the exclusive right to make, use and sell throughout the world all presently known CLOWARD INSTRUMENTS and to use the name "CLOWARD" in its advertising and marketing of said CLOWARD INSTRUMENTS." The Agreement provided, in general, that Codman would pay to CIC "a royalty at the rate of ten percent (10%) of the NET PROCEEDS FROM SALES received by CODMAN * * *." The payments were to continue for a period of 10 years "unless this Agreement *277 is terminated sooner." [2] The Agreement provided for minimum royalty payments of $11,500 and $12,500, respectively, during the first 2 years of its duration. Paragraph 9 provided that Codman would provide surgical exhibit space for Cloward Instruments at no fewer than 2 surgical meetings per year. Codman agreed to reimburse Dr. Cloward for reasonable travel and living expenses to attend those meetings "as his schedules permit," and Dr. Cloward agreed to attend meetings, as his schedule permitted, to promote the marketing of the instruments. Paragraph 27 provided that Codman would keep books of account containing an accurate and complete record of all data necessary to compute royalties payable to Dr. Cloward and to CIC. In addition, Codman agreed to provide a statement along with each royalty payment "showing the number of each type of instrument sold, the total billing price for each type of instrument sold, the total amounts *278 of discounts allowed, credits for claims or allowances, returns, and taxes or other Government charges added to the face of the invoice and paid by CODMAN for each type of instruments sold." Dr. Cloward and CIC were expressly granted the right to hire an independent certified public accountant "to vertify the accuracy of the royalty reports and the royalty payments made under this license * * *." The Agreement provided that "CODMAN may terminate this Agreement at any time subsequent to the second anniversary of the effective date of this Agreement by giving CIC and [Dr.] CLOWARD sixty (60) days advance written notice thereof." Pursuant to the Agreement, Dr. Cloward attended three surgical meetings in 1975 and four in 1976. These meetings each lasted from 3 to 4 days. At the meetings, Codman maintained an exhibit booth at which it displayed Cloward Instruments.Dr. Cloward spent about 6 hours per day at the booth advising surgeons who had encountered specific problems using his technique, answering questions, and showing his collection of books of x-rays which illustrated his surgical procedures. In the opinion of Codman's representative, Dr. Cloward was the only person in the *279 world who could have performed these services. Dr. Cloward's staff scheduled his surgeries around the known meeting dates so that surgeries would not have to be missed or canceled. Dr. Cloward would have spent an identical amount of time at the Codman booth even if the agreement had not been in effect. Dr. Cloward's efforts led to the successful promotion and marketing of Cloward Instruments on a worldwide basis. In 1970, Dr. Cloward prepared brochures describing the use of Cloward Instruments. CIC paid a medical illustrator to depict the steps of the operations. Codman did not reimburse CIC for the expense of hiring the medical illustrator. From 1969 through 1976, Dr. Cloward continued to provide Codman with new designs and with suggestions for improvements. On July 13, 1971, the United States Patent Office issued a trademark to Codman for the name "Cloward." Dr. Cloward was advised that the instruments themselves were not patentable, and no patents were ever issued. Codman considered the right to use the Cloward name to be an important asset. In addition, Codman considered its right to receive Dr. Cloward's services and aid in promoting Cloward Instruments to be an *280 important asset. When CIC approached Johnson and Johnson (Codman's parent company) with an offer to sell all of the CIC stock to Johnson and Johnson, Johnson & Johnson indicated that Codman would not be interested in CIC if Dr. Cloward were no longer available to provide services. Before 1969, Codman had not entered into agreements with other doctors calling for the payment of royalties. The agreement with CIC and Dr. Cloward represented the first such agreement into which Codman had entered for the payment of royalties. Subsequent agreements executed by Codman with doctors relating to the payments of royalties provided for payments of under 3 percent for non-patentable products. In accordance with the Agreement, Codman paid to CIC $72,412 in 1975, and $49,407 in 1976. Sales of Cloward Instruments surpassed Codman's expectations. When Codman entered into the Agreement, it did not expect sales to exceed $250,000 per year. Codman agreed to pay 10 percent of net sales proceeds to CIC because it did not believe that payments to CIC of $25,000 per year would be excessive in light of the services Codman expected from Dr. Cloward. Codman believed that Dr. Cloward's activities were *281 directly responsible for the absnece of competition with respect to Cloward Instruments. On July 1, 1976, CIC's shareholders voted to dissolve and liquidate the corporation. As part of the dissolution process, the shareholders voted to establish a trust to receive and liquidate certain real estate holdings. Kerry Bingham Cloward, a shareholder of CIC, was named as liquidating trustee. Pursuant to the agreement to dissolve CIC, the corporation made a partial distribution in 1976. The partial distribution consisted of the following: Item
Value
Cash
$21,000
Notes receiveable
94,000
Rights under the Agreement
between CIC, Dr. Cloward,
and Codman
? CIC executed an assignment to its three shareholders in equal amounts of all its rights under the Agreement with Codman. Although Mrs. Sattler held 40 percent of CIC's stock, each shareholder was treated as owning one-third of the outstanding shares. The third-quarter 1976 payment under the Codman Agreement was made to the CIC shareholders. During 1977, the balance of CIC's assets were distributed. As of December 31, 1977, CIC was fully liquidated, all assets having been distributed equally. During *282 the taxable years 1975 and 1976, CIC reported adjusted ordinary gross income of $77,662 and $50,812, respectively. The income as reported was composed of the following items: Year
Item
Amount
1975
Interest income
$ 5,250
1975
Income from Codman
72,412
77,662
1976
Interest income
640
1976
Net rental income
765
1976
Income from Codman
49,407
$50,812
The $94,000 in notes receivable held by CIC in 1976 represented demand notes for loans made by CIC to its shareholder, Kathleen C. Sattler, and her husband, James M. Sattler. Accrued but unpaid interest on these notes amounted to $15,635. As part of the partial dissolution distribution, notes for $16,000 each were distributed to each of the shareholders, Kerry Bingham Cloward, Karen McGregor, and Kathleen C. Sattler. James M. and Kathleen C. Sattler subsequently paid the $16,000 notes, plus accrued interest, which payments were made to Kerry Bingham Cloward and Karen McGregor, as follows: Total Amount
Date of Payment
Interest
Principal
Paid to Each
December 17, 1976
$1,665.56
$ 1,834.44
$ 3,500.00
December 22, 1976
3,665.56
3,665.56
December 30, 1976
500.00
500.00
March 10, 1977
250.00
4,000.00
4,250.00
Unidentified, 1977
733.33
733.33
June 1, 1977
853.52
5,266.67
6,120.19
$2,769.08
$16,000.00
$18,769.08
*283 In reporting the distribution from CIC in 1976, petitioners Kathleen C. Sattler and James M. Sattler valued the assets they received as follows: Value
Item
Assigned
Promissory note payable to CIC by
$14,500.00
James M. Sattler and Kathleen C. Sattler
(Face amount $16,000)
Cash
7,000.00
Right to receive payments from Codman
Accrued interest on promissory note
Payments received from Codman for the
7,133.67
third quarter in 1976
In filing their joint Federal income tax return for 1976, petitioners Kathleen C. and James M. Sattler reported the partial distributions received as capital gain in the amount of $28,633.67. They reported the right to receive future payments from Codman as having no ascertainable fair market value when received and therefore reported such rights at zero value on their return. On September 24, 1976, Dr. Cloward was 68 years old. The Agreement between Codman, CIC, and Dr. Cloward provided Codman with the right to terminate the Agreement after its second anniversary, provided that it gave 60 days written notice. Codman's representative believed in 1976 that sales of Cloward Instruments had peaked, and Codman's president *284 noted a downward trend in sales for the first half of 1976. Dr. Cloward's surgical procedure was never generally accepted by the medical community. Prior to November 23, 1976, Kerry Bingham Cloward, who was a shareholder of CIC as well as CIC's liquidating trust officer, determined that the present value of the remaining contract rights under the Codman agreement was $112,980, or $37,660 per shareholder. He calculated this amount by taking the average quarterly payments received as of that date, multiplying that number by the number of payments remaining assuming Codman did not exercise its right to terminate the contract, and taking the present value of the resulting figure. He did not take into account the termination provision because he was not aware of its existence, and he did not discuss with Codman whether they expected future sales to decline. Sometime in 1975 or 1976 prior to making this determination, Kerry Bingham Cloward applied for a bank loan from the Bank of Hawaii on behalf of CIC, offering as collateral the Codman Agreement. The Bank declined to issue a loan on the strength of the contract itself. Payments ultimately received by Kathleen C. Sattler as her *285 portion of the amounts paid by Codman under the Agreement from the third quarter of 1976 to the third quarter of 1979 (at which time the Agreement terminated) were as follows: Period Ending
Amount
September 1976
$ 7,134.00
December 1976
6,833.00
March 1977
6,457.00
June 1977
6,513.00
September 1977
7,780.00
December 1977
7,078.00
March 1978
7,025.00
June 1978
7,452.00
September 1978
5,719.00
December 1978
6,441.00
March 1979
6,524.00
June 1979
8,075.00
September 1979
3,915.00
Total
$86,946.00
OPINION 1. Accrued Interest
We first consider whether CIC must take into its income accrued but unpaid interest on demand notes for loans made by CIC to one of its shareholders. Pursuant to its plan of liquidation, CIC distributed the demand notes equally to its shareholders. At the time of distribution, interest in the amount of $15,635 had accrued on the notes. CIC had always reported its income in accordance with the cash method of accounting, and it did not report as income the accrued but unpaid interest on the demand notes. Respondent asserts that CIC's method of accounting did not clearly reflect its income because the corporation *286 had earned the interest prior to its liquidation. Petitioners argue that CIC's right to the interest would not have become fixed until it demanded payment, which it did not do. In addition, petitioners argue that the makers' financial ability to repay the loan in 1976 "was highly uncertain." As a result of these circumstances, petitioners argue, CIC should not be required to report the accrued interest as income. In general, taxable income is computed "under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books." Section 446(a). [3] If the taxpayer's method of accounting does not clearly reflect income, however, the computation of taxable income "shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income." Section 446(b). We conclude that CIC's treatment of the accrued but unpaid interest on demand notes at the time of its liquidation did not clearly reflect its income. The regulations state that generally, under *287 the cash receipts and disbursements method of computing taxable income, all items of gross income "are to be included for the taxable year in which actually or constructively received." Section 1.446-1(c)(1)(i), Income Tax Regs. Certain fundamental principles have long been recognized as exceptions to this general rule of accounting, however, and the Supreme Court has stated the following: In the ordinary case the taxpayer who acquires the right to receive income is taxed when he receives it, regardless of the time when his right to receive payment accrued. But the rule that income is not taxable until realized has never been taken to mean that the taxpayer, even on the cash receipts basis, who has fully enjoyed the benefit of the economic gain represented by his right to receive income, can escape taxation because he has not himself received payment of it from his obligor. The rule, founded on administrative convenience, is only one of postponement of the tax to the final event of enjoyment of the income, usually the receipt of it by the taxpayer, and not one of exemption from taxation where the enjoyment is consummated by some event other than the taxpayer's personal receipt of *288 money or property. * * * [Helvering v. Horst,311 U.S. 112, 115-116 (1940).] The Supreme Court in Horst concluded that a taxpayer who gave to his son interest coupons that had been attached to negotiable bonds was taxable on the interest even though he did not actually receive the interest himself.The general principle that income is to be taxed to whomever earns it has since been described as "the first principle of income taxation." Commissioner v. Culbertson,337 U.S. 733, 739 (1949). In the corporate context, assignment of income principles are vital because of the corporate incentive to avoid double taxation. The principle that "[t]he power to dispose of income is the equivalent of ownership of it," Helvering v. Horst,supra at 118, is especially true in the corporate-shareholder context, because "[a] body corporate can be said to enjoy its income in no other way" than by distributing its income to its shareholders. Williamson v. United States,155 Ct. Cl. 279, 289, 292 F.2d 524, 530 (1961). Accordingly, courts frequently have held that a corporation that had already "earned" income, or that *289 had a "fixed and determinable right to income," would not escape taxation by distributing to its shareholders the right to collect payment, E.g., Idaho First National Bank v. United States,265 F.2d 6 (9th Cir. 1959); J. Ungar, Inc. v. Commissioner,244 F.2d 90 (2d Cir. 1957), affg. 26 T.C. 331 (1956); Williamson v. United States,supra.[4] The issue in these cases distills to a determination of the "ripeness" of the income at the time of distribution. Compare Shea Co. v. Commissioner,53 T.C. 135 (1969), in which we held that unsettled legal claims had not been "earned" prior to corporate dissolution, with J. Ungar, Inc. v. Commissioner,supra, in which the Second Circuit held that income was earned when all remaining conditions to its collection were independent of any corporate action. Here interest in the amount of $15,635 had accrued on the notes at the time CIC distributed them to its shareholders. The interest had been "earned" in every sense of the word. In order to collect the interest, CIC *290 merely would have had to demand payment. [5] Compare Idaho First National Bank v. United States,supra, in which interest that had been earned but was not yet payable was held to be taxable to a cash-basis corporation.
In J. Ungar, Inc. v. Commissioner,supra at 93, the Court of Appeals found significant that "all conditions subsequent were independent of any action by the Corporation." We do not believe, however, that the necessity of making a formal demand for payment is the sort of condition that should prevent income from being treated as having been "earned." To permit a mere formality among related taxpayers to have so great an impact on tax consequences would be to permit the triumph *291 of form over substance. We therefore conclude that the interest was earned prior to the corporate liquidation, and that respondent may require CIC to include the income in the taxable year during which CIC distributed the notes. 2. Personal Holding Company
We next consider whether CIC is taxable as a personal holding company for the years 1975 and 1976. A corporation is treated as a personal holding company, and thus is subject to the personal holding company tax, if at least 60 percent of its adjusted ordinary gross income is "personal holding company income," and if, during the last half of the taxable year, more than half its value in stock is owned by no more than 5 individuals. Sections 541, 542(a)(1) and (2). The parties agree that the stock ownership test is met in this case. The term "personal holding company income" means the portion of adjusted ordinary gross income that consists of, among other things, "[d]ividends, interest, royalties (other than mineral, oil, or gas royalties or copyright royalties), * * * [and] [t]he adjusted income from rents." [6] Section 543(a)(1) and (2). CIC's income, as reported, consisted of "interest income," "net rental income, *292 " and income paid pursuant to the agreement with Codman. Characterization of the income paid pursuant to the Codman agreement will determine whether 60 percent of CIC's adjusted gross ordinary income constitutes personal holding company income. The Agreement granted to Codman the exclusive right to make, use and sell Cloward Instruments throughout the world, as well as the right to use the name "Cloward" in advertising and marketing Cloward Instruments. The Agreement provided for 10 percent "royalties," the percentage to be based upon net proceeds from sales, and did not provide for additional payment for Dr. Cloward's attendance at surgical meetings "as his schedules permit." Petitioners claim that despite the label provided in the Agreement, the payments in fact represented compensation for services. In the event that we do not conclude that the full amount of the payments were for services, petitioners argue that at least 70 percent of the payments should be treated as compensation for services. To be precise, in order to escape personal holding company status, petitioners would have to prove that *293 over $31,064,80 of $72,412 in 1975 payments (or over 43 percent), and that over $20,324.80 of $49,407 in 1976 payments (or over 54 percent) constitutes compensation for services. Dr. Cloward designed Cloward Instruments for use in a surgical procedure he developed. He agreed to, and in fact did, attend surgical conventions as his schedule permitted in order to answer questions about his surgical technique and about Cloward Instruments. He spent a maximum of 12 days in 1975 and 16 days in 1976 at these meetings. CIC received payments from Codman of $72,412 in 1975, and $49,407 in 1976. The term "royalties" includes "amounts received for the privilege of using patents, copyrights, secret processes and formulas, good will, trade marks, trade brands, franchises, and other like property." Section 1.543-1(b)(3), Income Tax Regs. In U.S. Universal Joints Co. v. Commissioner,46 B.T.A. 111, 116 (1942), the Board of Tax Appeals defined the term as the "payment of interest reserved by an owner in return for permission to use the property loaned and usually payable in proportion to use." Although the agreement with Codman characterizing the entire amount of the payments *294 as royalties is not conclusive, U.S. Universal Joints Co. v. Commissioner,supra, other facts convince us that the bulk of the payments were for a fixed percentage of net sales proceeds. Codman agreed to maintain detailed records and to provide a statement showing the number of each type of instrument sold, the total billing price for each instrument sold, total discounts allowed, and credits for claims, allowances, returns, taxes, and other government charges. Dr. Cloward and CIC reserved the right to hire an independent certified public accountant to verify the accuracy of the reports. The parties obviously went to great lengths to ensure that payments would be made proportionate to Codman's use of Dr. Cloward's designs. Such form of compensation is a hallmark of a royalty payment. See U.S. Universal Joints Co. v. Commissioner,supra at 116; Lane-Wells Co. v. Commissioner,43 B.T.A. 463 (1941), affd. on this issue 134 F.2d 977 (9th Cir. 1943), affd. and revd. on other issues 321 U.S. 219 (1944); Irving Berlin Music Corp. v. United States,203 Ct. Cl. 1, 12, 18, 487 F.2d 540, 546, 550 (1973). *295 This case is unlike U.S. Universal Joints Co. v. Commissioner,supra, in which we allocated half of a lump-sum payment to compensation for services. In that case, we found that the parties had agreed orally that substantial services were to be provided, even though this aspect of the agreement was not recorded in the written contract. Services far more substantial than the ones provided in the instant cases were in fact performed. One person devoted 100 percent of his time to performing services for the licensee on behalf of the licensor; another spent 30 perent of his time. One of the licensees considered the service aspect of the agreement more important than the license itself, since the licensee was losing money on the product. Codman (and thereby CIC) made its profit from selling instruments; Dr. Cloward's services to Codman's customers at surgical conventions were free to its customers and were not promised to those who purchased Cloward Instruments. Indeed, Dr. Cloward was bound to attend such conventions only "as his schedule permitted." On these facts we find it impossible to accept petitioners' suggestion that the payments were meant entirely *296 or even substantially, to represent payments for services. While some small portion of the payments may indeed have been intended to compensate Dr. Cloward for his time, that portion does not amount to enough to protect CIC from status as a personal holding company. [7] We certainly reject the suggestion that we should measure the value of the doctor's time by what he could have earned had he performed surgeries instead of attending the conventions. Dr. Cloward testified that his office scheduled surgeries around the conventions, and thus it does not appear that he surrendered any income he would have otherwise earned. Because we conclude that compensation for services represents a mere de minimis portion of the "royalty" payments, we need not address respondent's alternative contention that any payments for services would have been earned by Dr. Cloward *297 in his individual capacity, since he signed the agreement in his individual capacity as well as in his capacity as president of CIC. [8]
3.Value of Contract Rights to Shareholders
When CIC was liquidated, the shareholders received the right to collect the amounts to which CIC would have been entitled pursuant to its agreement with Codman. Petitioners James M. and Kathleen C. Sattler reported the right to receive their share of future payments from Codman as having no ascertinable fair market value. If the fair market value of the contract rights is not ascertainable, then this transaction will be treated as an "open transaction" under the doctrine of Burnet v. Logan,283 U.S. 404 (1931), and payments ultimately received pursuant to the contract will be treated as if they had been distributed at the time of liquidation. Westover v. Smith,173 F.2d 90 (9th Cir. 1949). Respondent asserts that this should not be treated as an "open transaction" because the contract *298 rights were susceptible of valuation at the time the shareholders received them. In the notice of deficiency, respondent ascribed a value of $78,681 to the contract rights. Respondent's brief does not explain how he arrived at that figure. Respondent's determinations are presumptively correct. Welch v. Helvering,290 U.S. 111 (1933).In order to overcome this presumption, petitioners must offer evidence that shows the determination to be erroneous. Gersten v. Commissioner,267 F.2d 195, 199 (9th Cir. 1959), affg. in part 28 T.C. 756 (1957). In addition, petitioners bear the burden of proof. Rule 142(a), Tax Court Rules of Practice and Procedure. Petitioners have presented evidence sufficient to convince us that the rights they received were "wholly contingent upon facts and circumstances not possible to foretell with anything like fair certainty." Burnet v. Logan,supra at 413. Petitioners received the right to receive a percentage of net sales proceeds from surgical instruments used in a procedure not generally accepted in the medical community. The agreement was subject to cancellation at any time with 60 days *299 notice. Dr. Cloward, the main proponent of the procedure, was 68 years old in 1976 when CIC was liquidated. On these facts, we conclude that one could not ascertain a fair market value for the contract rights when CIC was liquidated. In Dorsey v. Commissioner,49 T.C. 606, 629 (1968), this Court concluded that the value of the right to receive a percentage of receipts from the sale or lease to bowling alleys of automatic pinsetting machines "depended on numerous uncertainties of such a character as to make any estimate of the fair market value of those rights on that date sheer surmise and speculation." Those uncertainties included the unknown future potential of the bowling industry, the fact that the device was unproven and not yet accepted, potential competition, and the fact that another party controlled prices. We distinguished Dorsey from cases involving an established industry. The instant cases fall within the general criteria of Dorsey in that they involve a product whose future potential could not be predicted with reasonable certainty. See also Vestal v. United States,498 F.2d 487 (8th Cir. 1974); Estate of Stahl v. Commissioner,442 F.2d 324 (7th Cir. 1971), *300 affg. on this issue 52 T.C. 591 (1969); Lentz v. Commissioner,28 T.C. 1157 (1957); Clement v. United States,331 F. Supp. 877 (E.D.N.C. 1971). Compare Gersten v. Commissioner,supra.
Respondent suggests that since the parties had almost 7 years of experience under the contract, they should have been able to arrive at a fair valuation. It is true that Kerry Bingham Cloward, another shareholder, did ascribe a value to his interest. We note, however, that Kerry Bingham Cloward simply calculated the average of payments previously received, and assumed that such payments would continue for 3 more years, until the contract expired by it own terms. He was not even aware that Codman had the right to terminate the Agreement upon 60 days' notice. He did not discuss with Codman whether they expected future sales to decline. We certainly are not compelled to accept the calculations of a witness who has not taken account of contingencies. See Clement v. United States,supra at 880-881.We conclude, instead, that this is one of those "rare" cases in which fair market value was not ascertainable at the *301 time the right was received. See section 1.1001-1(a), Income Tax Regs.; Dorsey v. Commissioner,supra at 629. 4. Value of Notes Received in Liquidation
In addition to the contract rights, petitioners James M. and Kathleen C. Sattler received a promissory note upon CIC's liquidation.The note had been issued by them to CIC, and had a face value of $16,000. Petitioners reported the value of the note at $14,500. They claim that the discount is justified because full repayment of the face amount to CIC was uncertain. To the extent of any discount, however, petitioners would be treated as having received income from the cancellation of indebtedness. Section 61(a)(12); United States v. Kirby Lumber Co.,284 U.S. 1 (1931). This is a legal proposition, and does not turn upon the burden of proof, which would be borne by respondent as a new matter not determined in the notice of deficiency. Rule 142(a). Accordingly, Decisions will be entered under Rule 155.
Footnotes
1. The following cases have been consolidated for purposes of trial, briefing, and opinion: Cloward Instrument Corporation, Kathleen C. Sattler, Trustee and Kathleen C. Sattler, Transferee of the Assets of Cloward Instrument Corporation, docket No. 585-81, and James M. Sattler and Kathleen C. Sattler, docket No. 586-81.↩
2. The Agreement also specified that 10 percent royalties would be paid with respect to patented Coward Instruments until the patent's expiration date, unless the agreement was terminated sooner. None of the instruments were ever patented, however.↩
3. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, unless otherwise indicated.↩
4. Cf. Gorton v. Commissioner,T.C. Memo. 1985-45↩.
5. Petitioners also argue that "there is no evidence in the record which would establish that the makers of the notes had the ability to pay any or all of the accrued interest" to CIC at the time the notes were distributed to the shareholders. The burden of proof is on petitioners, however, to establish that the makers were unable to pay.Rule 142(a), Tax Court Rules of Practice and Procedure; Welch v. Helvering,290 U.S. 111↩ (1933).
6. Exceptions relating to some of these items are not relevant here.↩
7. At most, it might be reasonable to conclude that the amounts provided as minimum royalty payments represented compensation for services. No minimum payments were required during the years in issue, however, and in any event the minimum payments would be insufficient to avoid characterization as a personal holding company.↩
8. Petitioners did not argue on brief that they are entitled to deduct a deficiency dividend pursuant to sec. 547, and we therefore assume that they have conceded this issue.↩